**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Facundo Bouzat (SBN 316957)
fbouzat@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Nicholas Diamand
ndiamand@lchb.com
Douglas I. Cuthbertson
dcuthbertson@lchb.com
Abbye R. Klamann (SBN 311112)
aklamann@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592

**CARNEY BATES & PULLIAM, PLLC**
Hank Bates (SBN 167688)
hbates@cbplaw.com
Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
519 West 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

# REDACTED

*Attorneys for Plaintiffs individually and on
behalf of all others similar situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| AMANDA RUSHING, ASHLEY SUPERNAULT, JULIE REMOLD, and TED POON on behalf of themselves, and as parents and guardians of their children, L.L., M.S., N.B., C.B., R.P., and K.P., and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY; DISNEY ENTERPRISES, INC.; DISNEY ELECTRONIC CONTENT, INC.; UPSIGHT, INC.; UNITY TECHNOLOGIES SF; KOCHAVA, INC.; MOPUB, INC.; TWITTER INC.; COMSCORE, INC.; and FULL CIRCLE STUDIES, INC.<br><br>Defendants. | Case No. 3:17-cv-4419-JD<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  PARTIES ...................................................................................................... 1

III.  JURISDICTION AND VENUE .................................................................... 4

IV.  INTRADISTRICT ASSIGNMENT ............................................................... 6

V.  ALLEGATIONS APPLICABLE TO ALL COUNTS ...................................... 7

    A.  Defendants Surreptitiously Exfiltrate Children's Personal Data As They Play The Disney Gaming Apps. ...................................................................................... 7

        1.  The Role of Persistent Identifiers ................................................ 11

        2.  The Moment Users Launch A Disney Gaming App, The App Sends Children's Persistent Identifiers to the SDK Defendants .......................... 12

    B.  Defendants are Technology Companies that Contract with Disney to Target and Track Disney Gaming App Users. .............................................................. 13

        1.  Upsight ......................................................................................... 13

            a.  Upsight's Contracts with Disney ..................................... 14

            b.  Upsight is in the Business of Collecting Personal Data to Track and Profile Users. ...................................... 14

        2.  Unity ............................................................................................. 15

            a.  Unity's Contracts With Disney ........................................ 16

            b.  Unity is in the Business of Collecting Personal Data to Track and Profile Users ................................................. 16

        3.  Kochava ........................................................................................ 16

            a.  Kochava's Contracts With Disney ................................... 19

            b.  Kochava is in the Business of Collecting Personal Data to Track and Profile Users .......................................... 21

        4.  MoPub .......................................................................................... 21

            a.  MoPub's Contract With Disney ....................................... 22

            b.  MoPub is in the Business of Collecting Personal Data to Track and Profile Users .......................................... 23

        5.  ScoreCardResearch ...................................................................... 23

            a.  ScoreCardResearch is in the Business of Collecting Personal Data to Track and Profile Users ............................... 24

    C.  The SDK Defendants Continue to Exfiltrate Plaintiffs' Personal Data While Plaintiffs Play the Disney Apps. .............................................................. 24

        1.  Princess Palace Pets ..................................................................... 24

            a.  Kochava ........................................................................... 24

            b.  Upsight ............................................................................ 26

            c.  Unity ................................................................................ 28

        2.  Where's My Water? ...................................................................... 29

            a.  Kochava ........................................................................... 29

            b.  ScoreCardResearch .......................................................... 30

        3.  Where's My Water? 2 ................................................................... 32

            a.  Kochava ........................................................................... 32

**TABLE OF CONTENTS**

          b.      MoPub ................................................................... 33

          c.      Unity ..................................................................... 35

    4.    Where's My Water? (Free/Lite) ................................. 36

          a.      Kochava ............................................................... 36

          b.      ScoreCardResearch ............................................. 38

          c.      MoPub ................................................................... 39

D.    Disney's "Age Gate" Is Illusory and Does Not Protect Children's Privacy. ..........40

E.    The Privacy-Invasive and Manipulative Commercial Purposes Behind Defendants' Data Exfiltration, and its Effect on Child Users. ....................................................41

    1.    The Role of Persistent Identifiers in User Profiling and Targeted Advertising ................................................................ 41

    2.    Defendants Use Children's Personal Data to Target Them, Despite Children's Heightened Vulnerability to Advertising ................................ 45

    3.    Defendants Exfiltrate and Analyze Users' Personal Data to Track the Effect of Their Ads on Users' Behavior .................................................... 47

    4.    Defendants Use Personal Data to Encourage Children to Continue Using the App, Increasing the Risks Associated with Heightened Mobile Device Usage ............................................................................................................ 48

F.    State Privacy Laws Protect Children and Their Parents from Privacy-Invasive Tracking, Profiling, and Targeting of Children Online ..................................................53

    1.    Defendants' Surreptitious and Deceptive Collection of Personal Data Violates Plaintiffs' Reasonable Expectations of Privacy and is Highly Offensive. ...................................................................................................... 54

    2.    Defendants' Breach of Privacy Norms Is Compounded by Defendants' Targeting, Tracking, and Profiling of Children. ......................................... 61

G.    Disney's Omissions and Misrepresentations Create the False Impression That Its Apps Are Compliant with Privacy Laws and Norms. ...............................................64

    1.    Disney Markets Princess Palace Pets and the Where's My Water? Apps as Suitable for Children and in Compliance With All Applicable Privacy Laws and Norms. ...................................................................................... 65

          a.      Princess Palace Pets ........................................... 65

          b.      Where's My Water? ........................................... 66

          c.      Where's My Water? Free/Lite ......................... 67

          d.      Where's My Water? 2 ....................................... 67

    2.    Disney Explicitly and Falsely States That It Does Not Track Children or Collect Personal Data in Violation of Privacy Laws and Norms. .............. 71

    3.    Despite its Assertions that it Abides by Privacy Norms and Laws, Disney's Chief Executive Officer Publicly Supports Norm and Privacy-Violative Advertising Behaviors ..................................................................... 73

    4.    The SDK Defendants Violate Their Own Privacy Commitments. ............. 74

H.    Fraudulent Concealment and Tolling ....................................................................74

I. Named Plaintiff Allegations. ........................................................................................74

    1.    Plaintiff Amanda Rushing and Her Child, L.L. ......................................... 74

    2.    Plaintiff Ashley Supernault and Her Child, M.S. ..................................... 75

**TABLE OF CONTENTS**

3.   Plaintiff Julie Remold and Her Children, N.B. and C.B. ........................... 76

4.   Plaintiff Ted Poon and His Children, R.P. and K.P. ................................. 76

VI.   CLASS ALLEGATIONS ............................................................... 77

VII.   CLAIMS FOR RELIEF ............................................................... 81

VIII.   PRAYER FOR RELIEF .............................................................. 89

DEMAND FOR JURY TRIAL .................................................................. 92

1  **I.**  **INTRODUCTION**

2      1.      This is an action brought by parents to protect the privacy of their children.

3  Defendants acted together to take personal data from children while they play the gaming apps

4  Where's My Water?, Where's My Water? Free/Lite,[1] and Where's My Water? 2 (together,

5  "Where's My Water? Apps") and Princess Palace Pets (together with Where's My Water? Apps,

6  "Disney Gaming Apps") on their mobile devices, and to track children's online behavior to

7  profile them for targeted advertising and other commercial exploitation.   Defendant Disney's

8  C.E.O. has publicly touted its intention to track online behavior and then sell that data.

9  Defendants' conduct invaded the reasonable expectation of privacy of the parents and their

10  children, violating existing social norms and their concomitant legal standards.   Plaintiffs bring

11  claims under the California law of Intrusion Upon Seclusion on behalf of themselves and a class

12  of parents from thirty-five states (having the same California state law claim), as well as state-

13  specific privacy claims on behalf of the California Subclass, the New York Class and the

14  Massachusetts Class.  Plaintiffs seek an injunction to stop Defendants' unlawful practices and

15  sequester their unlawfully-obtained information, and an award of reasonable damages.

16  **II.**  **PARTIES**

17      **Plaintiffs**

18      2.      Plaintiffs are the parents of children who played online gaming apps operated by

19  the Defendants.

20      3.      Plaintiff Amanda Rushing and her child, "L.L.," reside in San Francisco,

21  California.  Ms. Rushing brings this action on behalf of herself, L.L., and all others similarly

22  situated.  L.L. is a minor and played the gaming app Princess Palace Pets on a mobile device.

23      4.      Plaintiff Ashley Supernault and her child, "M.S.," reside in Agawam,

24  Massachusetts.  Ms. Supernault brings this action on behalf of herself, M.S., and all others

25  similarly situated.  M.S. is a minor and played Where's My Water? Free and Where's My Water?

26  2 on mobile devices.

27

28  [1] For Android devices, the app is called Where's My Water? Free.  For Apple devices, the same app is called Where's My Water? Lite.

5.      Plaintiff Julie Remold and her children, N.B. and C.B., reside in Menlo Park, California.  Ms. Remold brings this action on behalf of herself, N.B., C.B., and all other similarly situated.  N.B. and C.B. are minors and played Where's My Water? on a mobile device.

6.      Plaintiff Ted Poon and his children, R.P. and K.P., reside in New York, New York.  Mr. Poon brings this action on behalf of himself, R.P., K.P., and all other similarly situated.  R.P. and K.P. are minors and played Where's My Water? Lite on mobile devices.

**The Disney Defendants**

7.      Defendant The Walt Disney Company is a diversified worldwide entertainment company that (i) runs major media networks; (ii) operates parks and resorts; (iii) produces live and animated films; and (iv) licenses, develops, and publishes consumer products and interactive media, including games for children on mobile platforms through Disney's "Consumer Products & Interactive Media" segment.  This segment generates revenue primarily from – among other things – the sale of online games, in-game purchases, and advertising through online video content.  Disney developed and marketed the Disney Gaming Apps used by Plaintiffs' children, and apps used by millions of people in the United States.  It is headquartered at 500 South Buena Vista Street, Burbank, California 91521.

8.      Defendant Disney Enterprises, Inc. is a wholly-owned subsidiary of The Walt Disney Company that functions as the merchandising and licensing division of The Walt Disney Company, and is the registered owner of Disney-branded trademarks, copyrights, and other intellectual property assets.  It is headquartered at 500 South Buena Vista Street, Burbank, California 91521.

9.      Defendant Disney Electronic Content, Inc. is identified as the "seller" in the Apple App Store and the "developer" in the Google Play Store for the Disney Gaming Apps.  It is headquartered at 500 South Buena Vista Street, Burbank, California 91521.

10.     Defendants The Walt Disney Company, Disney Enterprises, Inc., and Disney Electronic Content, Inc., are collectively referred to here as "Disney."

**The SDK Defendants**

11.     The "SDK Defendants" – identified in paragraphs 12 through 16 below – are entities which provided their own proprietary computer code to Disney, known as software development kits ("SDKs"), for installation and use in the Disney Gaming Apps, including Princess Palace Pets and the Where's My Water? Apps.  Disney embedded each of the SDK Defendants' SDKs into the Disney Gaming Apps, causing the transmittal of app users' Personal Data—including in the form of persistent identifiers—to the SDK Defendants to facilitate subsequent tracking, profiling, and targeting.  As used herein, "Personal Data" is any data that refers to, is related to, or is associated with an identified or identifiable individual.

12.     SDK Defendant Upsight, Inc. ("Upsight") is an American technology company headquartered at 501 Folsom St., San Francisco, California 94105.  As of January 2016, Upsight owns the Fuse Powered SDK.

13.     SDK Defendant Unity Technologies SF ("Unity") is an American technology headquartered at 30 3rd Street, San Francisco, California 94103.

14.     SDK Defendant Kochava, Inc. ("Kochava") is an American technology company headquartered at 201 Church Street, Sandpoint, Idaho 83864, with offices in San Francisco, California.

15.     SDK Defendant MoPub, Inc. ("MoPub") is an American technology company headquartered at 1355 Market Street Suite 900, San Francisco, California 9410, and is a wholly owned subsidiary of Defendant Twitter, Inc., located at the same address.

16.     SDK Defendant comScore, Inc. is an American technology company headquartered at 11950 Democracy Drive, Suite 600, Reston Virginia 20190 with offices in San Francisco, Menlo Park, and Los Angeles, California.  SDK Defendant Full Circle Studios, Inc. is an American technology company and wholly owned-subsidiary of comScore, Inc. headquartered at 11950 Democracy Drive, Suite 600, Reston Virginia 20190.  The ScoreCardResearch SDK embedded in Where's My Water? 2 and Where's My Water? Free/Lite is a service of Full Circle Studios, Inc. and comScore Inc. (comScore, Inc. and Full Circle Studios, Inc. together, "ScoreCardResearch").

1   **III.     JURISDICTION AND VENUE**

2          17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

3   §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the

4   sum of $5,000,000, exclusive of interest and costs, and in which Plaintiffs and some members of

5   the proposed Classes and Sub-Class are citizens of a state different from some Defendants.  The

6   Disney Gaming Apps have been downloaded hundreds of millions of times.  Plaintiffs' good faith

7   estimate, based on download statistics and demographic data, is that there are tens of millions of

8   members in the Intrusion Upon Seclusion Class across thirty-five states, tens of millions of

9   members of the California Sub-Class, and tens of millions of members of the New York Class

10  and the Massachusetts Class, resulting in damages that far exceed $5,000,000, exclusive of

11  interest and costs.

12         18.     This Court has personal jurisdiction over Defendants because they purposefully

13  direct their conduct at California, transact business in California (including in this District), have

14  substantial aggregate contacts with California (including in this District), purposely availed

15  themselves of the laws of California, and engaged and are engaging in conduct that has and had a

16  direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons

17  throughout the United States—including persons Defendants knew or had reason to know are

18  located in California (including in this District).  Defendants Upsight, Unity, MoPub, and Disney

19  are headquartered in California.  Kochava markets its presence in San Francisco, California[2] and

20  its headquarters' proximity to the Bay Area (stating its headquarters are "a short 1:40 flight from

21  the Oakland airport").[3]  comScore, Inc. has offices in Menlo Park, San Francisco, and Los

22  Angeles, California.[4]

23

24

25  [2] *See* "Locations," Kochava, *available at* https://www.kochava.com/careers/#location (accessed June 4, 2018).

26  [3] *See* "Company," Kochava, *available at* https://www.kochava.com/company/ (accessed June 4, 2018).

27  [4] *See* "Office Locations," comScore Inc., *available at* https://www.comscore.com/About-comScore/office-locations (accessed June 4, 2018).

28

19.    The Defendants' activities in California gave rise to and furthered the privacy violations suffered by Plaintiffs and their children.  Disney contracted with each of the SDK Defendants to exfiltrate the Personal Data of Disney Gaming App users and to send it to the SDK Defendants where it could be analyzed and monetized for Defendants' financial gain, in violation of Plaintiffs' privacy expectations.  Specifically, California-based Disney contracted with numerous SDK Defendants – including California-based SDK Defendants[5] – to input data-exfiltrating code into the Disney Gaming Apps.  The cooperation between each of the SDK Defendants and Disney—memorialized in these contracts— resulted in the exfiltration of Plaintiffs' children's Personal Data from their devices and use for Defendants' commercial gain. But for such cooperation, Plaintiffs and their children would not have been harmed.

20.    This Court has specific jurisdiction over the non-California based SDK Defendants, including Kochava and comScore, because they intentionally aimed their conduct at California knowing such activity would harm users in California.  Kochava and comScore contracted to have their respective SDKs embedded in co-Defendant Disney's Gaming Apps to track and profile children – including children they knew, or had reason to know, were located in California – for commercial purposes.  Kochava and comScore purposefully directed their actions at California when they used their SDKs – downloaded with the Disney Gaming Apps onto California residents' devices – to exfiltrate and profit off Californians' Personal Data.  Using their SDKs, Kochava and comScore targeted and tracked such users, injuring them in California. Kochava and comScore knew or should have known that users were located in California. Forensic testing reveals that both Kochava and comScore exfiltrate Disney Gaming App users' IP addresses, data that reveals the location of those users.  ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

21.    Additionally, Kochava's activities in California – as they relate to and give rise to the harms alleged in this action – are extensive.  Kochava works closely with California-based

---

[5] SDK Defendants Upsight, Unity, and MoPub are headquartered in California.

███████████████████

companies, including Disney. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

22.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendants transact business in this District, and because numerous Defendants reside in this District.  Specifically, SDK Defendants Upsight, Unity, and MoPub are headquartered in San Francisco.

IV.     **INTRADISTRICT ASSIGNMENT**

23.     Pursuant to Civil L.R. 3-2(c), assignment to this Division is proper because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this District. Defendants market their products throughout the United States, including in San Francisco and Alameda counties.  In addition, most SDK Defendants are headquartered in or have offices in San Francisco.

---

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████
████████

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

V.    **ALLEGATIONS APPLICABLE TO ALL COUNTS**

A.    **Defendants Surreptitiously Exfiltrate Children's Personal Data As They Play The Disney Gaming Apps.**

24.    Disney styles and promotes the Disney Gaming Apps as fun, kid-friendly games.

25.    Princess Palace Pets is available for download as a mobile gaming app in online stores, including Google's "Play Store" and Apple's "App Store."  Princess Palace Pets has been downloaded millions of times.[11]  Disney markets Princess Palace Pets as game for children. Indeed, it is presented with an "Everyone" rating in Google's Play Store and with a "4+" rating in Apple's App Store.  Google Play ratings "are intended to help consumers, especially parents, identify potentially objectionable content that exists within an app" and are based on the app developer's responses to questionnaires provided by Google – i.e. the ratings reflect the developer's representations about the appropriate audience for the app.[12]  An "Everyone" rating means the app's content is "generally suitable for all ages."[13]  Similarly, the Apple age ratings are based on questionnaires completed by the app developer regarding the app's content and reflect its representations about the app's suitability for children,[14] and a 4+ rating indicates that the game is suitable for users ages 4 and older.  Additionally, Princess Palace Pets is listed in Google's Designed for Families ("DFF") program, reflecting Disney's proactive efforts to specifically market Princess Palace Pets to children younger than age 13.  Apps listed in the DFF program are "featured through Google Play's family-friendly browse and search experiences so that parents can more easily find suitable, trusted, high-quality apps and games" and "must be relevant for children under the age of 13."[15]

---

[11] "Disney Princess Palace Pets," Google Play Store, *available at* https://play.google.com/store/apps/details?id=com.disneydigitalbooks.PalacePets_goo&hl=en_US (accessed June 4, 2018) (showing that Princess Palace Pets has been downloaded more than a million times by Android users alone).

[12] "Play Console Help," Google, *available at* https://support.google.com/googleplay/android-developer/answer/188189?hl=en (accessed June 4, 2018).

[13] *Id.*

[14] "App Store Review Guidelines," Apple, *available at* https://developer.apple.com/app-store/review/guidelines/ (accessed June 4, 2018).

[15] "Designed for Families," Google Play, *available at* https://developer.android.com/distribute/google-play/families (accessed June 4, 2018).

*Figure 1*[16]

26.     Disney Princess Palace Pets users read and listen to stories about various Disney princesses' pets, and groom and accessorize the animals.  The description encourages children to "[l]earn how the pets met the princesses, find out their unique talents, and treat them to a delightful day at the Royal Pet Salon!"[17]

27.     Similarly, the Where's My Water? Apps are styled as child-appropriate games in both the App Store and Play Store.  Each is rated "4+" in the App Store and "Everyone" in the Play Store.  Where's My Water? and Where's My Water? Free/Lite are listed in the Google DFF program.  The apps are some of the most popular family apps in the App Store; for example, Where's My Water? is ranked the 6th most popular family app.[18]  Where's my Water? and Where's My Water? 2 are both free apps, while Where's My Water? costs $1.99 to download.  Together, the Where's My Water? Apps have been downloaded more than 200 million times worldwide.[19]

---

[16] Figure 1 is a picture of Princess Palace Pets as advertised in the Apple App Store, as of June 4, 2018.

[17] "Disney Princess Palace Pets," Google Play Store, *available at* https://play.google.com/store/apps/details?id=com.disneydigitalbooks.PalacePets_goo&hl=en_US (accessed June 4, 2018).

[18] "Where's My Water," Apple App Store, *available at* https://itunes.apple.com/us/app/wheres-my-water/id449735650?mt=8 (accessed June 4, 2018).

[19] *See* "Where's My Water? Lite," Google Play Store, *available at* https://play.google.com/store/apps/details?id=com.disney.WMWLite (accessed June 4, 2018).

1
2
3
4
5
6
7
8
9
10



11
12

*Figure 2*[20]

13      28.      Each of the Where's My Water? Apps share the same story line: kids must help

14   an alligator named "Swampy" fill the bathtub with water by navigating puzzle-like challenges.

15   As described in the App Store: "Swampy the Alligator lives in the sewers under the city. He's a

16   little different from the other alligators – he's curious, friendly, and loves taking a nice long

17   shower after a hard day at work. But there's trouble with the pipes and Swampy needs your help

18   getting water to his shower!"[21]

19      29.      Plaintiff parents or their children installed the Disney Gaming Apps onto their

20   mobile devices for children to play.

21
22

_____

23   (stating Where's My Water? Lite has been downloaded more than 100 million times by Android
     users alone); "Where's My Water? 2," Google Play Store, *available at*
24   https://play.google.com/store/apps/details?id=com.disney.wheresmywater2_goo (accessed June 4,
     2018) (stating Where's My Water? 2 has been downloaded more than 100 million times by
25   Android users alone); "Where's My Water," Google Play Store, *available at*
     https://play.google.com/store/apps/details?id=com.disney.WMW (accessed June 4, 2018) (stating
26   Where's My Water?  has been downloaded more than 1 million times by Android users alone).
     [20] Figure 2 is a picture of Where's My Water? as advertised in the Apple App Store, as of June 4,
27   2018.
     [21]  "Where's My Water," Apple App Store, *available at* https://itunes.apple.com/us/app/wheres-
28   my-water/id449735650?mt=8 (accessed June 4, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

30.     Unbeknownst to parents and their children, Disney—in partnership with the SDK Defendants—collects and exfiltrates Personal Data as users play the Disney Gaming Apps. Defendants completely fail to inform Disney Gaming App users that, as they play the games, Defendants are surreptitiously collecting the Personal Data and tracking online behavior to profile users for commercial purposes.  Users of the Disney Gaming Apps have no reasonable way to know, and Defendants fail to disclose, that when users download the Disney Gaming Apps onto their mobile devices, the SDK Defendants' data collection and tracking software is also simultaneously downloaded.  Users have no reason to identify the SDK Defendants and their policies, or the existence of them.  Even while playing the Disney Gaming Apps, users have no reasonable way to determine that advertising SDKs have been embedded onto their mobile devices.

31.     As users play the Disney Gaming Apps, the SDK software collects their Personal Data and, without the users' knowledge or consent, exfiltrates the Personal Data to sophisticated technology companies.  From there, the data is used to track, profile, and target users for Defendants' financial gain.

32.     Targeted advertising is driven by users' Personal Data and the SDKs employ sophisticated algorithms that interpret that Personal Data to determine the most effective advertising for individual users.  Once exfiltrated to an SDK Defendant, the Personal Data harvested from Disney Gaming App users can be combined with other data associated with that same user via persistent identifiers or by using other data (*e.g.*, online activity or demographics) which can track and identify the same user.   This is often accomplished via an ad network where additional data may be associated with the user in a similar fashion.

33.     The ad network is also where the buying and selling of advertising space takes place.  It is a virtual marketplace where app developers and advertisers buy and sell advertising space and the ads to fill it.  These networks connect advertisers looking to sell data driven, targeted ads to mobile apps that want to host advertisements.  A key function of an ad network is aggregating available ad space from developers and matching it with advertisers' demands.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

34.     Using advanced, custom analytics and network analysis tools, Plaintiffs have been able to: (1) determine which SDK entities have their software embedded into the Disney Gaming Apps; (2) record network traffic as it leaves the devices, including encrypted data; (3) detect the Personal Data that Defendants access in real time and exfiltrate from users' devices; and (4) identify the SDK Defendants that received Personal Data.

### 1.     The Role of Persistent Identifiers

35.     The most common data Defendants take from Plaintiffs' devices and use for tracking, profiling, and targeting are called persistent identifiers.  These identifiers are a set of unique data points (typically numbers and letters), akin to a social security number, and can link one specific individual to all of the apps on her device and her activity on those apps, allowing her to be tracked over time and across devices (*e.g.*, smart phones, tablets, laptops, desktops and smart TVs).

36.     The common persistent identifiers for Apple are the ID for Advertisers ("IDFA") and ID for Vendors ("IDFV").  Both the IDFA and the IDFV are unique, alphanumeric strings that are used to identify an individual device—and the individual who uses that device—in order to track and profile the user, and to serve her with targeted advertising.

37.     The common persistent identifiers in the Android operating system are the Android Advertising ID ("AAID") and the Android ID.  The AAID and Android ID are unique, alphanumeric strings assigned to a user's device and used by apps and third-parties to track and profile the user, and to serve her targeted advertising.

38.     Additionally, each Apple and Android device can be identified by its "Device Fingerprint" data, which is another form of persistent identifier.  Device Fingerprint data include myriad individual pieces of data about a specific device, including details about its hardware— such as the device's brand (*e.g.*, Apple or Android) and the type of device (*e.g.*, iPhone, Galaxy, iPad)—and details about its software, such as its operation system (*e.g.*, iOS or Android).  This data can also include more detailed information, such as the network carriers (*e.g.*, Sprint, T-Mobile, AT&T), whether it is connected to Wi-Fi, and the "name" of the device.  The name of the device is often particularly personal, as the default device name is frequently configured to

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

include users' first and/or last names (*e.g.*, "Jane Minor's iPhone").  In combination, the pieces of data comprising the Device Fingerprint provide a level of detail about the given device that allows that device and its user to be identified individually, uniquely, and persistently—as the appellation "Fingerprint" implies.

39.     Defendants exfiltrate and analyze persistent identifiers—including a user's IDFA/IDFV (for Apple devices), Android ID/AAID (for Android devices), or Device Fingerprint data[22]—in order to learn more about users, including their behaviors, demographics, and preferences, and, thereafter, to serve them with tailored and targeted advertising and otherwise monetize the Personal Data for Defendants' use.  Defendants also use persistent identifiers to track the effectiveness of those advertisements after the user sees them (to determine, for example, whether the user downloaded the app or bought the product advertised) and encourage the user to keep engaging with the app.

### 2.     The Moment Users Launch A Disney Gaming App, The App Sends Children's Persistent Identifiers to the SDK Defendants

40.     As soon as  a user opens up one of the Disney Gaming Apps on her device and it connects to the Internet—even before she begins to play the game—the app will connect to a server belonging to one of the SDK Defendants and begin sending that server data.  This activity is invisible to the user, who simply sees the given app's game interface.  However, forensic analysis of the Internet communication between the device and server can capture the data exchanged between the two.

41.     As the user plays the given Disney Gaming App, but invisible to the user, the embedded SDKs communicate with each of their individual servers (*e.g.*, the Kochava SDK communicates with the Kochava server).  The SDKs send requests for an ad—or "calls"—to the server.  As there are multiple SDKs embedded in a given Disney Gaming App, multiple SDKs are

---

[22] There are multiple, additional items of data that are universally recognized as persistent identifiers.  For example, a device's Wi-Fi MAC address is a fixed serial number that is used to identify one's phone when transmitting and receiving data using Wi-Fi.  Plaintiffs' forensic analysis has principally focused on the exfiltration and use of IDFA/IDFV, Android ID/AAID, and Device Fingerprint data persistent identifiers.  However, as alleged herein, multiple SDK Defendants acknowledge collecting *additional* persistent identifiers.

contacting their servers in the background while the user plays the game. With each request from each SDK, the SDK also sends the child user's Personal Data, including in the form of persistent identifiers. The user may receive a single ad (or even no ads at all, in the case of attribution and analytics gathering[23]), but nonetheless multiple SDKs have exfiltrated to their servers the user's Personal Data. The SDK Defendant then stores and analyzes the Personal Data to enable continued tracking of the user, such as what ads she has already seen, what actions she took in response to those ads, other online behavior, and additional demographic data. This way, the SDK Defendants (and other entities in the ad network) can generally monitor, profile, track her over time, across devices, and across the Internet.

42.  The exfiltration of this Personal Data, the purposes for which it is used, and the lack of restrictions placed on its exfiltration, retention, and use are demonstrated through forensic testing and the contracts between Disney and each of the SDK Defendants.

43.  In addition to what forensic analysis reveals, Defendants each purport to collect a host of other items of Personal Data and to comingle those into expansive and valuable data profiles.

**B.  Defendants are Technology Companies that Contract with Disney to Target and Track Disney Gaming App Users.**

**1.  Upsight**

44.  Upsight is a mobile advertising company.[24] Upsight has a large presence in the mobile advertising industry, and through that presence exfiltrates from users "more than 500 billion data points" every month and uses that data to serve more than 1.4 billion targeted web and mobile communications (including ads) every month.[25] By collecting data from online users, including "millions of unique user profiles,"[26] and creating meaningful profiles of them, Upsight offers companies the ability to deliver targeted advertisements.[27]

---

[23] *See* Section V.E., *infra.*

[24] "Company Overview of Upsight, Inc.," Bloomberg, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=100662027 (accessed June 4, 2018).

[25] "About Us," Upsight, *available at* https://www.upsight.com/aboutUs/ (accessed June 4, 2018).

[26] "Data without Limits," Upsight, *available at* https://www.upsight.com/analytics/ (accessed

45.     In acquiring the Fuse Powered SDK, Upsight sought to further its vision of "offer[ing] every important piece of functionality and service that a mobile app developer needs to be successful."[28]   Upsight's view on data collection is clear: "You can never know too much."[29]

46.     The Upsight SDK is embedded in Princess Palace Pets.

### a.     Upsight's Contracts with Disney[30]

███████

### b.     Upsight is in the Business of Collecting Personal Data to Track and Profile Users

48.     As alleged herein, Upsight is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and Upsight affiliates.  ████████

---

June 4, 2018).
[27] "Integrated Web & Mobile Marketing," Upsight, *available at* https://www.upsight.com/marketing/ (accessed June 4, 2018).
[28] Andy Yang, "Our Customers Lead the Way," Upsight, Jan. 28, 2016, *available at* http://blog.upsight.com/blog/our-customers-lead-the-way (accessed June 4, 2018).
[29] "Data Without Limits," Upsight, *available at* https://www.upsight.com/analytics/ (accessed June 4, 2018).
[30] Copies of the contracts between Disney and SDK Defendants Upsight, Unity, and Kochava have been produced through discovery by counsel for the individual SDK Defendants to Plaintiffs' counsel, and are subject to the Protective Order in this Action (Dkt. No. 124 in related case *McDonald, et al. v. Kiloo ApS, et al.*, Case No. 3:17-cv-04344-JD).  Each contract has been designated "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY" by the producing party.  Accordingly, all excerpts from all contracts (and all references thereto) have been redacted in this Complaint.

1   ███████████████████████████ Disney does not disclose to its users—nor do

2   users have any reasonably practical way to identify—Disney's relationship with Upsight, that it

3   embeds Upsight's software in the Disney Gaming Apps, or that Disney uses Upsight's services to

4   collect and exfiltrate their Personal Data via their use of the Disney Gaming Apps.

5                            **2.      Unity**

6          49.     Unity is a mobile advertising company.  Unity markets its ability to increase user

7   engagement with mobile apps and deliver profitable targeted advertisements.  As it states on its

8   website, "Unity Ads enables publishers to integrate video ads into [their] mobile games in a way

9   that both increases player engagement and puts more money in [developer's] pocket over the

10  gamer's lifetime."[34]

11         50.     Unity's technology is widely used in the mobile gaming industry and it claims its

12  "engine is far more popular amongst developers than any other third-party game development

13  software."[35]

14         51.     Using Unity's technology, app developers can, as Unity represents, "[b]e among

15  the first to access . . .  a whole network of advertisers competing for space in your game - and

16  paying top dollar."[36]  Unity's SDK technology collects user information for purposes of serving

17  targeted advertisements: "Machine Learning Based Targeting delivers to advertisers the most

18  relevant eyeballs."[37]

19         52.     To maximize the profitability of ads, Unity offers ad attribution services—

20  described further below—which permit advertisers to track a user and determine whether an ad

21  leads the user to download the advertised app.

22         53.     The Unity SDK is embedded in Princess Palace Pets and at least one Where's My

23  Water? App – Where's My Water? 2.

---

[34] "Unity Ads: Get Paid for All Your Hard Work," Unity, *available at*
https://unity3d.com/unity/features/ads (accessed June 4, 2018).
[35] "Unity: Company Facts," Unity, *available at* https://unity3d.com/public-relations (accessed
June 4, 2018).
[36] "Unity Ads: Get Paid for All Your Hard Work," Unity, *available at*
https://unity3d.com/unity/features/ads (accessed June 4, 2018).
[37] *Id.*

a.      **Unity's Contracts With Disney**



b.      **Unity is in the Business of Collecting Personal Data to Track and Profile Users**

56.     As alleged herein, Unity is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and Unity affiliates. ████████████████████████████ ████████████████████ Disney does not disclose to its users—nor do users have any reasonably practical way to identify—Disney's relationship with Unity, that it embeds Unity's software in the Disney Gaming Apps, or that Disney uses Unity's services to collect and exfiltrate their Personal Data via their use of the Disney Gaming Apps.

**3.      Kochava**

57.     Kochava is a mobile technology company.  Kochava offers, *inter alia*, mobile attribution services, which permit advertisers to track whether a user downloads an app after she is served an ad for that app while playing one of the Disney Gaming Apps.  Kochava calls such

---

[42] *See* Section V.G.4, *infra*.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

attribution "one of the most powerful tools at an advertiser's disposal."[43]  In order to track the user – and her subsequent activity online over time and across the Internet – Kochava's "mobile attribution platform identifies a user by device ID, fingerprint, and IP address."[44]  Kochava then tracks the user as she navigates the internet, watching to see whether she responds favorably to the advertisement she was shown (by, for example, downloading the advertised app).   Then, "[b]y considering every available data point,"—including persistent identifiers—Kochava determines which ad should get attribution–or credit – for the user's ultimate action (it calls this "determining the winning engagement") and crediting that advertiser.[45]  Even where a persistent identifier, such as an AAID or IDFA, is not collected—including when the IDs are not exfiltrated because there are "legal reasons precluding the capture of device id"—Kochava advertises its ability to use the Device Fingerprint data as a workaround to match a user's device to an ad she clicked or saw.[46]

58.    Kochava markets its ability to match individual users to their devices using what it calls "cross-device algorithms."[47]  The graphic below illustrates how Kochava uses persistent identifiers to track user behavior and to identify users—including children—at the *individual* level, even where there are multiple users of the same device:[48]

---

[43] "Configurable Attribution," Kochava, *available at* https://www.kochava.com/configurable-attribution/ (accessed June 4, 2018).

[44] "Homepage," Kochava, *available at* https://www.kochava.com/ (accessed June 4, 2018).

[45] "Configurable Attribution," Kochava, *available at* https://www.kochava.com/configurable-attribution/ (accessed June 4, 2018).

[46] *Id.*

[47] "Holistic Attribution," Kochava, *available at* https://www.kochava.com/holistic-attribution/ (accessed June 4, 2018).

[48] *Id.*

1

2

3

4

5

6

7

8

9

10

11

12



*Figure 3*

13

14   59.     In the above example, Kochava purports to be able to use its tracking technology

15   to identify individual members of a household ("Dad," "Mom," and "Kid," respectively) and to

16   monitor (and specifically attribute and distinguish) their individual behavior on a variety of

17   household electronics.

18   60.     Kochava claims to have the "the world's largest independent mobile data

19   marketplace," offering "rich audience targeting capabilities across all the major platforms,"

20   including ad networks.[49]  Kochava collects and combines mobile users' data on its platform, the

21   Kochava Collective.  Kochava gets the data for its Kochava Collective first-hand by exfiltrating it

22   from users—like Plaintiffs—through its SDK embedded in mobile apps (Kochava states that its

23   SDK "touches over 1 billion devices globally") and from acquiring additional data from other

24   third-parties, including ad networks.[50]  It uses these third-parties to "provide unique enrichment"

25

26   _____

[49] "Kochava Collective Rockets to Over 1 Billion Addressable Mobile Devices for Audience
Targeting," Kochava, *available at* http://www.kochava.com/kochava-collective/ (accessed June 4,

27   2018).
[50] "Kochava Collection," Kochava, *available at* http://www.kochava.com/kochava-collective/

28   (accessed June 4, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

to the data it exfiltrates through its SDK.[51]   In other words, Kochava is utilizing all of the data that it can acquire, either directly or through third-parties, to build the most detailed of profiles as possible on individual users, in order to track and target them over time and across the Internet. Kochava's efforts lead to collection of large amounts of data on *billions* of users: Kochava states that it has "more than 1 billion unique device profiles, with millions added daily."[52]

61.     In addition to attribution, Kochava's database of Personal Data facilitates targeted advertising based on users' demographics, interests, and behaviors.  Specifically, Kochava states that using its Personal Data and services, advertisers can target their desired ad audiences based on users' "recently visited locations, application usage, audience interest and device details."[53] The data stored by Kochava is "mapped against key data sets to help match [latitudes and longitudes] to POIs, user agents to device details, app bundle IDs to app store names, categories, and much more."[54]

62.     "[P]artners who make their data available in the [Kochava] Collective are able to not only monetize their segments, but also generate incremental revenue when their data elements are utilized for informing custom segment creation and lookalike modeled audiences."[55]

63.     The Kochava SDK is embedded in the Where's My Water? Apps and Disney Princess Palace Pets.

a.     **Kochava's Contracts With Disney**

███ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ ██████████████████████████████████████

---

[51] *Id.*

[52] "Target," Free App Analytics, *available at* https://www.freeappanalytics.com/target/ (accessed June 4, 2018).

[53] "Promote You App," Free App Analytics, *available at* https://www.freeappanalytics.com/promote-your-app/ (accessed June 4, 2018).

[54] "Audience Targeting Just Got a Whole Lot Easier," Kochava, *available at* https://www.kochava.com/audience-targeting-just-got-whole-lot-better/ (accessed June 4, 2018)

[55] *Id.*

██ ███████████



AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

1  ███████████████████████ █ ████████████████████

2  █████████████████████████████████████████████████

3  ███████████████████████████████████████████

4  ████████ ▌

5          **b.      Kochava is in the Business of Collecting Personal Data to Track**

6                   **and Profile Users**

7          69.     As alleged herein, Kochava is in the business of collecting Personal Data to track

8  and profile users—including children—and sharing such Personal Data with publishers,

9  advertisers, service providers, and Kochava affiliates.  ██████████████████

10 █████████████████████████  Disney does not disclose to its users—nor do

11 users have any reasonably practical way to identify—Disney's relationship with Kochava, that it

12 embeds Kochava's software in the Disney Gaming Apps, or that Disney uses Kochava's services

13 to collect and exfiltrate their Personal Data via their use of the Disney Gaming Apps.

14         **4.      MoPub**

15         70.      MoPub is a mobile advertising company owned by Twitter.  MoPub "provides

16 monetization solutions for mobile app publishers and developers around the globe."[66]  MoPub

17 enables app developers to profit from targeted advertising, including through use of its

18 programmatic (or real time bidding ("RTB") platform), the MoPub Marketplace.[67]  An RTB

19 platform enables the automated buying and selling of mobile ads "in an auction environment,"[68]

20 using sophisticated algorithms that allow instantaneous buying and selling.  MoPub functions like

21 a matchmaker—it uses data to "target the right inventory [app users] with the right mobile ad

22 network partner."[69]  In turn, the ads served to mobile app users are "based on rich data signals to

23 _____

24 ▌
   ████████████

25 [66] "Homepage," MoPub, *available at* https://www.mopub.com/ (accessed June 4, 2018).

26 [67] "MoPub Marketplace," MoPub, *available at* https://www.mopub.com/marketers/marketplace/
   (accessed June 4, 2018).

27 [68] *Id.*

   [69] "MoPub's Platform Maximizes Your Revenue," MoPub, *available at*
28 https://www.mopub.com/publishers/platform/ (accessed on June 4, 2018).

increase yield on every impression [advertisement]" and maximize an app developer's advertising revenue.[70]

71.     MoPub is able to serve its matchmaking function due to the ubiquity of its SDK. MoPub states that it works with more than 50,000 mobile apps on more than 1.5 billion mobile devices[71] and services 450 billion monthly app advertisement requests.[72]  By relying on its wealth of personal data, including data obtained from third-parties, MoPub gives advertisers "access to rich and unique data, enhancing their targeting abilities."[73]

72.     The MoPub SDK is embedded in Where's My Water? Lite/Free and Where's My Water? 2 apps.

### a.     MoPub's Contract With Disney

[REDACTED]

---

[70] *Id.*

[71] "MoPub Marketplace," MoPub, *available at* https://www.mopub.com/marketers/marketplace/ (accessed June 4, 2018).

[72] "Our History," MoPub, *available at* https://www.mopub.com/company/history/ (accessed June 4, 2018).

[73] "Confidently Reach Your Audience in Mobile Apps," MoPub, *available at* https://www.mopub.com/dsp/platform/ (accessed June 4, 2018).

[REDACTED]

1

        **b.**      **MoPub is in the Business of Collecting Personal Data to Track and Profile Users**

2

3      74.    As alleged herein, MoPub is in the business of collecting Personal Data to track

4 and profile users—including children—and sharing such Personal Data with publishers,

5 advertisers, service providers, and MoPub affiliates.  ████████████████████████

6 ████████████████████████████  Disney does not disclose to its users—nor do

7 users have any reasonably practical way to identify—Disney's relationship with MoPub, that it

8 embeds MoPub's software in the Disney Gaming Apps, or that Disney uses MoPub's services to

9 collect and exfiltrate their Personal Data via their use of the Disney Gaming Apps.

10        **5.**      **ScoreCardResearch**

11      75.    Upon information and belief, comScore, Inc. ("comScore") and its subsidiary Full

12 Circle Studios, Inc. ("Full Circle") own the ScoreCardResearch SDK.  The ScorecardResearch

13 SDK utilizes ad tracking technology as a part of comScore's efforts to track users across the web,

14 including across mobile apps.[77]

15      76.    comScore is a research company that measures consumer behavior and facilitates

16 online advertising.  comScore describes itself as a "leader in cross-platform measurement of

17 audiences, advertising and consumer behavior.  Built on precision and innovation, comScore

18 combines proprietary TV, digital and movie viewing data with vast demographic details to

19 measure consumers' multiscreen behavior at scale. With more than 3,200 clients and a global

20 footprint in 70 countries, comScore is delivering the future of media measurement."[78]  comScore

21 offers various online services which permit app developers and advertisers to deliver targeted ads

22 based on "insight into consumer demographics, behaviors and interests."[79]  By tracking users

23 across multiple platforms—including television, desktops, and mobile devices—comScore

24 facilitates targeted advertising.

25 [77] "Welcome," ScoreCard Research, *available at*
https://www.scorecardresearch.com/home.aspx?newlanguage=1 (accessed June 4, 2018).

26 [78] "About," comScore, *available at* https://www.comscore.com/About-comScore (accessed June 4, 2018).

27 4, 2018).

[79] "comScore Activation," comScore, *available at*
28 https://www.comscore.com/Products/Activation (accessed June 4, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

77.     Similarly, Full Circle is a market research company that studies and reports on Internet trends and behavior.  Full Circle claims to work "in conjunction with with [sic] content providers and distributors to develop an anonymous, census-level analysis of Internet usage. As part of this effort, participating content providers and distributors add a web beacon and cookie to their sites allowing Full Circle Studies to collect anonymous information about general visitation patterns."[80]  In order to engage in market research, Full Circle uses ScoreCardResearch's domain to aid in the collection of personal data.

78.     The ScoreCardResearch SDK is embedded in the Where's My Water? and Where's My Water? Free/Lite apps.

### a.      ScoreCardResearch is in the Business of Collecting Personal Data to Track and Profile Users

79.     As alleged herein, ScoreCardResearch is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and ScoreCardResearch affiliates.  Disney engages ScoreCardResearch to perform these same services.  Disney does not disclose to its users—nor do users have any reasonably practical way to identify—Disney's relationship with ScoreCardResearch, that it embeds ScoreCardResearch's software in the Disney Gaming Apps, or that Disney uses ScoreCardResearch's services to collect and exfiltrate their Personal Data via their use of the Disney Gaming Apps.

### C.      The SDK Defendants Continue to Exfiltrate Plaintiffs' Personal Data While Plaintiffs Play the Disney Apps.

#### 1.      Princess Palace Pets

##### a.      Kochava

80.     To exfiltrate Princess Palace Pets users' Personal Data for tracking and profiling purposes, the Kochava SDK embedded in Princess Palace Pets communicates with or "makes a call" to Kochava's servers (as evidenced by, for example, data being sent to servers affiliated with

---

[80] "About Full Circle Studies," Full Circle Studies, *available at* http://www.fullcirclestudies.com/home.aspx (accessed June 4, 2018).

the address `control.kochava.com`).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA and IDFV (for Apple devices) or AAID (for Android devices).

81.     Additionally, Kochava receives the IP address of the child user's device, which enables the identification of the user's location, the identification of the user's device, and cross-device tracking.  An IP address is a unique number that identifies a given device, allowing it to communicate with other computers on the Internet (which have their own IP addresses).

82.     Kochava's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, profile, and target specific users. This information can include, *inter alia*:

> a.     The user's language;
>
> b.     The user's device operating system and version;
>
> c.     The user's Kochava device ID;[81]
>
> d.     The manufacturer, make, and model of the user's device; and
>
> e.     The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[82] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | `A203BB39-0B2C-3B03-C837-93B3CC938E21` | Jane Minor's device's unique IDFV |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |

---

[81] According to Kochava's website, the Kochava device ID is a persistent identifier assigned by Kochava.  *See* "Query Reference," Kochava, *available at* https://support.kochava.com/advanced-tools/query-reference (accessed June 4, 2018).

[82] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| User's language | Accept-Language: en-US | Jane Minor's Princess Palace Pets app is in American English |
|---|---|---|
| Manufacturer and make of the user's device | User-Agent: iPhone | Jane Minor is playing Princess Palace Pets on her Apple iPhone |
| User's Kochava device ID | "kochava device id": KMN7FB4801DD4328V2VFE5931HB3F2 272A | Jane Minor's unique device identifier assigned by Kochava |
| User's device operating system and version | • "platform": "ios"<br>• "os_version": "iPhone OS 7.1" | Jane Minor's phone is running Apple's iOS 7.1 |
| Application name and developer | • "Kochava app id": "kodisneyprincesspalacepets ios"<br>• "package_name": "DisneyDigitalBooks.PalaceP ets" | Jane Minor is a Disney Princess Palace Pets user |

### b.   **Upsight**

83.     To exfiltrate Princess Palace Pets users' Personal Data for tracking and profiling purposes, the Upsight SDK embedded in the Princess Palace Pets app makes a call to Upsight's servers (as evidenced by, for example, data being sent to servers affiliated with the address `api.fusepowered.com`). This call contains the user's persistent identifiers including, among others, her IDFV (for Apple devices) or Android ID and AAID (for Android devices).

84.     Upsight also receives a "timestamp," the time at which an advertising event is recorded by Upsight. In the ad tech world, this data point plays a useful role: it tracks time from a pre-established start date. The timestamp tells online companies exactly when an ad is requested after the start date—measured to the second or millisecond—and thus permits a company to know when a user is active on her phone regardless of the time zone in which she resides. Ad companies can use this data, which can be sorted to create trends of individual users, in efforts to boost user engagement, as well as attribution tracking described in Section V. E.

85.     Upsight also receives the IP address of the child user's device.

86.     Upsight's call can also disclose other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, profile, and target specific users. This information can include, *inter alia*:

a.     The user's language;

b.      The manufacturer, make, and model of the user's device;

c.      The user's device operating system and version;

d.      The screen dimensions of the user's device; and

e.      The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[83] | Personal Information Derived from Data |
|---|---|---|
| IDFV (Apple users) | `A203BB39-0B2C-3B03-C837-93B3CC938E21` | Jane Minor's device's unique IDFV |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| Android ID (Android users) | `28507917b736aa32` | Jane Minor's device's unique Android ID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `Accept-Language: en-US` | Jane Minor's Princess Palace Pets app is in American English |
| Manufacturer, make, and model of the user's device | • `User-Agent: iPhone`<br>• `"model": "iPhone"`<br>• `"machine": "iPhone 8,1"` | Jane Minor is playing Princess Palace Pets on her Apple iPhone |
| User's device operating system and version | `"sysname": "iPhone OS"`<br>`"sysver": "10.3.2"` | Jane Minor's phone is running Apple's iOS 10.3.2 |
| Screen dimensions of the user's device | `"w": 375`<br>`"h": 667` | Jane Minor's device screen is 667 by 375 |
| Timestamp | `timestamp: 1527608937` | Jane Minor took a specified action on Princess Palace Pets on May 29, 2018 at 15:48:57[84] UTC[85] |
| Application name and developer | `"bundle": "DisneyDigitalBooks.PalacePets"` | Jane Minor is a Disney Princess Palace Pets user |

---

[83] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

[84] The timestamp is formatted to track the number of seconds since Jan. 1, 1970.  By using a decoder, such as http://coderstoolbox.net/unixtimestamp, the timestamp can be converted to an exact date and time.

[85] Coordinated Universal Time

### c. Unity

87.    To exfiltrate Princess Palace Pets users' Personal Data for tracking and profiling purposes, the Unity SDK embedded in Princess Palace Pets makes a call to Unity's servers (as evidenced by, for example, data being sent to servers affiliated with the address `stats.unity3d.com`).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFV (for Apple devices) or AAID (for Android devices).

88.    Unity also receives the IP address of the child user's device.

89.    Unity's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, profile, and target specific users.  This information can include, *inter alia*:

> a.    The user's language;
>
> b.    The manufacturer, make, and model of the user's device;
>
> c.    The user's device operating system and version;
>
> d.    The screen dimensions of the user's device; and
>
> e.    The name and developer of the app the user is operating.

| Identifier | Exemplar Data Field[86] | Personal Information Derived from Data |
|---|---|---|
| IDFV (Apple users) | `A203BB39-0B2C-3B03-C837-93B3CC938E21` | Jane Minor's device's unique IDFV |
| Android ID (Android users) | `28507917b736aa32` | Jane Minor's device's unique Android ID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `Accept-Language: en-US` | Jane Minor's Princess Palace Pets app is in American English |

---

[86] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| Manufacturer and make of the user's device | Model: iPhone 8,1 | Jane Minor is playing Princess Palace Pets on her Apple iPhone |
|---|---|---|
| User's device operating system and version | OS: iPhone OS 10.3.2 | Jane Minor's phone is running Apple's iOS 10.3.2 |
| Screen dimensions of the user's device | Screen: 750x1334 | Jane Minor's device screen is 750 by 1334 |
| Application name and developer | appId: DisneyDigitalBooks. PalacePets | Jane Minor is a Disney Princess Palace Pets user |

### 2. Where's My Water?

#### a. <u>Kochava</u>

90. To exfiltrate Where's My Water? users' Personal Data for tracking and profiling purposes, the embedded Kochava SDK makes a call to Kochava's servers (as evidenced by, for example, data being sent to servers affiliated with the address `control.kochava.com`). This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA (for Apple devices) or AAID (for Android devices).

91. Kochava also receives the IP address of the child user's device and timestamp data.

92. Kochava's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, track, profile, and target specific users. This information can include, *inter alia*:

    a. The user's language;

    b. The screen dimensions of the user's device;

    c. The user's device operating system and version;

    d. The user's Kochava device ID;

    e. The manufacturer, make, and model of the user's device; and

    f. The name, developer, and version of the app the user is operating.

| Data Point | Exemplar Data Field[87] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `104.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `Accept-Language: en-US` | Jane Minor's Where's My Water? app is in American English |
| Manufacturer, make, and model of the user's device | `"device": "iPhone6,1"` | Jane Minor is playing Where's My Water? on her Apple iPhone 6,1 |
| Timestamp | `"usertime": "1527608937"` | Jane Minor took a specified action in Where's My Water? on May 29, 2018 at 15:48:57 UTC |
| User's device operating system and version | `"os version": "iPhone OS 10.3.2"` | Jane Minor's phone is running Apple iOS 10.3.2 |
| User's Kochava device ID | `"kochava device id": KMN7FB4801DD4328V2VFE593 1HB3F2272A` | Jane Minor's unique device identifier assigned by Kochava |
| Screen dimensions of the user's device | • `"disp h": 1136`<br>• `"disp w": 640` | Jane Minor's device screen is 1136 by 640 |
| Application name, developer, and version | • `"package name": "com.disney.SwampyGame"`<br>• `"app version": "1.0"` | Jane Minor is a Disney Where's My Water?[88] (v.1.0) user |

**b.    ScoreCardResearch**

93.    To exfiltrate Where's My Water? users' Personal Data for tracking and profiling

purposes, the embedded ScoreCardResearch SDK makes a call to ScoreCardResearch's servers

(as evidenced by, for example, data being sent to servers affiliated with the address

b.scorecardresearch.com).  This call contains the user's Personal Data, in the form of persistent

identifiers including, among others, her AAID (for Android devices).

---

[87] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

[88] "Swampy Game" is the former name of the Where's My Water? Apps.

94.    ScoreCardResearch also receives the IP address of the child user's device.

95.    ScoreCardResearch's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, track, profile, and target specific users.  This information can include, *inter alia*:

        a.    The user's language;

        b.    The user's device operating system and version;

        c.    The manufacturer, make, and model of the user's device;

        d.    Whether the user has a wireless Internet connection (Wi-Fi);

        e.    The screen dimensions of the user's device; and

        f.    The name, developer, and version of the app the user is operating.

| Data Point | Exemplar Data Field[89] | Personal Information Derived from Data |
|---|---|---|
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `206.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `ns ap lang=en` | Jane Minor's Where's My Water? app is in English |
| User's device operating system and version | • `ns ap pn: android`<br>• `ns_ap_pv: 6.0.1` | Jane Minor's phone is running the Android 6.0.1 operating system |
| Manufacturer, make, and model of the user's device | • `ns ap device: bullhead`<br>• `User-Agent: AOSP on Bullhead Build)` | Jane Minor is playing Where's My Water? on her LG Nexus[90] phone |

---

[89] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Android device.

[90] "Bullhead" refers to LG's Nexus cell phone.  *See, e.g.*, "Report: 'Bullhead' and 'Angler' are Your New Nexus Devices Made by LG and Huawei," droidlife (May 25, 2016), *available at* https://www.droid-life.com/2015/05/26/report-bullhead-and-angler-are-your-new-nexus-devices-made-by-lg-and-huawei/ (accessed June 4, 2018).

| User's internet connection | `ns radio=wifi` | Jane Minor's device is connected to wireless internet |
|---|---|---|
| Screen dimensions of the user's device | `ns ap sd=1080x1920` | Jane Minor's device screen is 1080 by 1920 |
| Application name, developer, and version | • `ns ap bi=com.disney.WMW`<br>• `ns_ap_ver=1.15.0` | Jane Minor is a Disney Where's My Water? (v.1.15.0) user |

### 3.   Where's My Water? 2

#### a.   Kochava

96.     To exfiltrate Where's My Water? 2 users' Personal Data for tracking and profiling purposes, the embedded Kochava SDK makes a call to Kochava's servers (as evidenced by, for example, data being sent to servers affiliated with the address `control.kochava.com`).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA (for Apple devices) or AAID (for Android devices).

97.     Kochava also receives the IP address of the child user's device.

98.     Kochava's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, track, profile, and target specific users.  This information can include, *inter alia*:

          a.     The user's language;

          b.     The manufacturer, make, and model of the user's device;

          c.     The user's device operating system and version;

          d.     The user's Kochava device ID;

          e.     The screen dimensions of the user's device; and

          f.     The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[91] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `206.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `Accept-Language: en-US` | Jane Minor's Where's My Water? 2 app is in American English |
| Manufacturer, make, and model of the user's device | `"device": "iPhone 6,1"` | Jane Minor is playing Where's My Water? 2 on her Apple iPhone |
| User's device operating system and version | `"os version": "iOS 10.3.2"` | Jane Minor's phone is running Apple's iOS 10.3.2 |
| User's Kochava device ID | `"kochava device id": KMN7FB4801DD4328V2VFE5931HB3F2272A` | Jane Minor's unique device identifier assigned by Kochava |
| Screen dimensions of the user's device | `"disp h": "1136"` `"disp w": "640"` | Jane Minor's device screen is 1136 by 640 |
| Application name and developer | `"package name": "com.disney.wheresmywater2"` | Jane Minor is a Disney Where's My Water? 2 user |

**b.**   **MoPub**

99.    To exfiltrate Where's My Water? 2 users' Personal Data for tracking and profiling purposes, the MoPub SDK embedded in the Where's My Water? 2 app makes a call to MoPub servers (as evidenced by, for example, data being sent to servers affiliated with the address `ads.mopub.com`).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA (for Apple devices) or AAID (for Android devices).

100.    MoPub also receives the IP address of the child user's device.

---

[91] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

101.    MoPub's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, profile, and target specific users.  This information can include, *inter alia*:

a.    The user's language;

b.    The user's time zone;

c.    The user's cellular carrier;

d.    The manufacturer, make, and model of the user's device;

e.    The user's device operating system and version;

f.    The screen dimensions of the user's device; and

g.    The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[92] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `206.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `Accept-Language: en-US` | Jane Minor's Where's My Water? 2 app is in American English |
| User's time zone | `Z: -0700` | Jane Minor is playing Where's My Water? 2 in a time zone 7 hours behind GMT |
| User's mobile network | `cn: T-Mobile` | Jane Minor's service provider is T-Mobile |
| Manufacturer and make of the user's device | `dn: iPhone 6,1` | Jane Minor is playing Where's My Water? 2 on her Apple iPhone |
| User's device operating system and version | `User-Agent: iPhone OS 10 3 2` | Jane Minor's phone is running Apple's iOS 10.3.2 |
| Screen dimensions of the user's device | `h: 1136`<br>`w: 640` | Jane Minor's device screen is 1136 by 640 |

[92] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| Application name and developer | bundle: com.disney.wheresmywater2 | Jane Minor is a Disney Where's My Water? 2 user |
|---|---|---|

### c.   Unity

102.    To exfiltrate Where's My Water? 2 users' Personal Data for tracking and profiling purposes, the Unity SDK embedded in the Where's My Water? 2 app makes a call to Unity servers (as evidenced by, for example, data being sent to servers affiliated with the address publisher-config.unityads.unity3d.com).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA (for Apple devices) or AAID (for Android devices).

103.    Unity also receives the IP address of the child user's device.

104.    Unity's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, profile, and target specific users.  This information can include, *inter alia*:

a.    The user's language;

b.    The manufacturer, make, and model of the user's device;

c.    The user's device operating system and version; and

d.    The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[93] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | A203BB39-0B2C-3B03-C837-93B3CC938E21 | Jane Minor's device's unique IDFV |
| AAID (Android users) | A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2 | Jane Minor's device's unique AAID |
| User's device's IP address | 206.3.128.12 | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |

---

[93] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| User's language | `Accept-Language: en-US` | Jane Minor's Where's My Water? 2 app is in American English |
| Manufacturer and make of the user's device | `deviceModel: iPhone 6,1` | Jane Minor is playing Where's My Water? 2 on her Apple iPhone |
| User's device operating system and version | `Platform: ios`<br>`osVersion: 10.3.2` | Jane Minor's phone is running Apple's iOS 10.3.2 |
| Application name and developer | `bundleId=`<br>`com.disney.wheresmywater2` | Jane Minor is a Disney Where's My Water? 2 user |

105.    Forensic analysis has shown that Unity can share Personal Data with other, undisclosed third-parties.  That analysis further shows that in the course of loading an ad in Where's My Water? 2, Unity worked in conjunction with its subsidiary, Applifier—a separate online marketing company specializing in ad attribution[94]—to permit Applifier to track the user's activities subsequent to viewing the ad (specifically, providing Applifier with an IDFA/AAID, Device Fingerprint, and a host of other, proprietary tracking data) for ad attribution purposes.

### 4.    Where's My Water? (Free/Lite)

#### a.    Kochava

106.    To exfiltrate Where's My Water? Free/Lite users' Personal Data for tracking and profiling purposes, the embedded Kochava SDK makes a call to Kochava's servers (as evidenced by, for example, data being sent to servers affiliated with the address `control.kochava.com`).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA (for Apple devices) or AAID (for Android devices).

107.    Kochava also receives the IP address of the child user's device.

108.    Kochava's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, track, profile, and target specific users.  This information can include, *inter alia*:

---

[94] "Unity Technologies to Acquire Applifier to Bring Everyplay Social Gaming Community and GameAds Video Ads to Unity," Unity, *available at* https://unity3d.com/company/public-relations/news/unity-technologies-acquire-applifier-bring-everyplay-social-gaming (accessed June 4, 2018).

a.      The user's language;

b.      The screen dimensions of the user's device;

c.      The user's device operating system and version;

d.      The user's Kochava device ID;

e.      The manufacturer, make, and model of the user's device; and

f.      The name, developer, and version of the app the user is operating.

| Data Point | Exemplar Data Field[95] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `206.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `Accept-Language: en-US` | Jane Minor's Where's My Water? Free/Lite app is in American English |
| Manufacturer, make, and model of the user's device | `"device": "iPhone6,1"` | Jane Minor is playing Where's My Water? Free/Lite on her Apple iPhone 6,1 |
| User's device operating system and version | `"os version": "iPhone OS 10.3.2"` | Jane Minor's phone is running Apple iOS 10.3.2. |
| User's Kochava device ID | `"kochava device id": KMN7FB4801DD4328V2VFE5931HB3 F2272A` | Jane Minor's unique device identifier assigned by Kochava |
| Screen dimensions of the user's device | • `"disp h": 1136`<br>• `"disp w": 640` | Jane Minor's device screen is 1136 by 640 |
| Application name, developer, and version | • `"package name": "com.disney. SwampyGameLite"`<br>• `"app version": "1.0"` | Jane Minor is a Disney Where's My Water? Free/Lite (v.1.0) user |

---

[95] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

### b.  ScoreCardResearch

109.   To exfiltrate Where's My Water? Free/Lite users' Personal Data for tracking and profiling purposes, the embedded ScoreCardResearch SDK makes a call to ScoreCardResearch's servers (as evidenced by, for example, data being sent to servers affiliated with the address b.scorecardresearch.com).  This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her AAID (for Android devices).

110.   ScoreCardResearch also receives the IP address of the child user's device.

111.   ScoreCardResearch's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, track, profile, and target specific users.  This information can include, *inter alia*:

    a.   The user's language;

    b.   The user's device operating system and version;

    c.   The manufacturer, make, and model of the user's device;

    d.   The user's Internet connection;

    e.   The screen dimensions of the user's device; and

    f.   The name, developer, and version of the app the user is operating.

| Data Point | Exemplar Data Field[96] | Personal Information Derived from Data |
|---|---|---|
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `206.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | `ns ap lang=en` | Jane Minor's Where's My Water? Free/Lite app is in English |
| User's device operating system and version | • `ns ap pn: android`<br>• `ns_ap_pv: 6.0.1` | Jane Minor's phone is running the Android 6.0.1 operating system |

[96] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Android device.

| Manufacturer, make, and model of the user's device | • ns ap device: bullhead<br>• User-Agent: AOSP on Bullhead Build) | Jane Minor is playing Where's My Water? Free/Lite on her LG Nexus phone |
|---|---|---|
| User's internet connection | ns radio=wifi | Jane Minor's device is connected to wireless internet |
| Screen dimensions of the user's device | ns ap sd=1080x1920 | Jane Minor's device screen is 1080 by 1920 |
| Application name, developer, and version | • ns ap bi=com.disney. WMWLite<br>• ns ap ver=1.0 | Jane Minor is a Disney Where's My Water? Free/Lite (v.1.0) user |

### c.     **MoPub**

112.     To exfiltrate Where's My Water? Free/Lite users' Personal Data for tracking and profiling purposes, the MoPub SDK embedded in the Where's My Water? Free/Lite app makes a call to MoPub servers (as evidenced by, for example, data being sent to servers affiliated with the address `ads.mopub.com`). This call contains the user's Personal Data, in the form of persistent identifiers including, among others, her IDFA (for Apple devices) or AAID (for Android devices).

113.     MoPub also receives the IP address of the child user's device.

114.     MoPub's call to its servers also discloses other valuable Personal Data in the form of Device Fingerprint data that can be used to identify, profile, and target specific users. This information can include, *inter alia*:

a.     The user's language;

b.     The user's time zone;

c.     The user's cellular carrier;

d.     The manufacturer, make, and model of the user's device;

e.     The user's device operating system and version;

f.     The screen dimensions of the user's device; and

g.     The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[97] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | B3626A74-54CZ-314C-C825-C2A87669D561 | Jane Minor's device's unique IDFA |
| AAID (Android users) | A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2 | Jane Minor's device's unique AAID |
| User's device's IP address | 216.3.128.12 | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number |
| User's language | Accept-Language: en-US | Jane Minor's Where's My Water? Free/Lite app is in American English |
| User's time zone | Z: -0700 | Jane Minor is playing Where's My Water? Free/Lite in a time zone 7 hours behind GMT |
| User's mobile network | cn: T-Mobile | Jane Minor's service provider is T-Mobile |
| Manufacturer and make of the user's device | dn: iPhone 6,1 | Jane Minor is playing Where's My Water? Free/Lite on her Apple iPhone |
| User's device operating system and version | User-Agent: iPhone OS 10 3 2 | Jane Minor's phone is running Apple's iOS 10.3.2 |
| Screen dimensions of the user's device | h: 1136 w: 640 | Jane Minor's device screen is 1136 by 640 |
| Application name and developer | bundle: com.disney.SwampyGameLite | Jane Minor is a Disney Where's My Water? Free/Lite user |

### D.   Disney's "Age Gate" Is Illusory and Does Not Protect Children's Privacy.

115.   On both Android and Apple versions of the Where's My Water? Apps,[98] recent versions of the Apps include age screening, or an "age gate."   However, Disney's belated and facile implementation of age verification or age gating to identify child users of the Where's My Water? Apps is illusory and does not protect children's privacy.

116.   Disney's age gating does no more than simply prompt users to input their age before accessing the respective Where's My Water? app.  Thus, Disney's age gating depends

---

[97] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

[98] No age gate was observed in Princess Palace Pets.

exclusively on the reliability of the user's inputted data.  It fails to require any independent

method to verify a majority age, explain the purpose behind requiring a user to provide their age,

or contain any advisory message that minors should not themselves download the app.  As such,

Disney's age gating can be easily circumvented with uninformed and inaccurate self-reporting,

and therefore fails to adhere to minimal standards of best practices.

117.    Further, forensic testing reveals that the age entered (*e.g.*, 99 vs. 10) did not affect

the number of third-parties contacted or the types of Personal Data that they received.  Regardless

of whether an adult's or child's age was specified, data was shared with Kochava,

ScorecardResearch, MoPub, Unity, and, in certain instances, third-party attribution entities,

including Applifier.

118.    The presence of the Disney age gate heightens the invasiveness of the apps and

increases the potential for the exfiltration of child users' Personal Data, because the mere

presence of the age gate implies that Disney will abide by social norms that require parental

consent before conducting business with a minor.

E.      **The Privacy-Invasive and Manipulative Commercial Purposes Behind Defendants' Data Exfiltration, and its Effect on Child Users.**

1.      **The Role of Persistent Identifiers in User Profiling and Targeted Advertising**

119.    Disney and the SDK Defendants, in coordination, collect and use the Personal

Data described above to track, profile, and target children with targeted advertising.

120.    When children are tracked over time and across the Internet, various activities are

linked to a unique and persistent identifier to construct a profile of the user of a given mobile

device.  Viewed in isolation, a persistent identifier is merely a string of numbers uniquely

identifying a user, but when linked to other data points about the same user, such as app usage,

geographic location (including likely domicile), and Internet navigation, it discloses a personal

profile that can be exploited in a commercial context.

121.    Defendants aggregate this data, and also buy it from and sell it to third-parties, all

the while amassing more data points on users to build ever-expanding profiles for enhanced

targeting.  Across the burgeoning online advertising ecosystem – often referred to as the "mobile

1   digital marketplace" – multiple ad networks or other third-parties can buy and sell data,

2   exchanging databases amongst themselves, creating an increasingly sophisticated profile of how,

3   when, and why a child uses her mobile device, along with all of the demographic and

4   psychographic inferences that can be drawn therefrom.

5        122.    The Federal Trade Commission (the "FTC") provides an illustration of these

6   precise identifiers being used to amass a data profile, via an SDK embedded within an app.  In its

7   2012 report entitled "Mobile Apps for Kids:  Disclosures Still Not Making the Grade," (the "FTC

8   Mobile Apps for Kids Report") addressing privacy dangers for children in the app space, the FTC

9   cited forensic analysis in which:

10            [O]ne ad network received information from 31 different apps. Two
             of these apps transmitted geolocation to the ad network along with a
11           device identifier, and the other 29 apps *transmitted other data (such
             as app name, device configuration details, and the time and
12           duration of use) in conjunction with a device ID. The ad network
             could thus link the geolocation information obtained through the
13           two apps to all the other data collected through the other 29 apps
             by matching the unique, persistent device ID.*[99]
14

15        123.    The FTC expressed particular "[c]oncerns about creation of detailed profiles based

16   on device IDs [such as those created and facilitated by Defendants] …where…companies (like ad

17   networks and analytics providers) collect IDs and other user information through a vast network

18   of mobile apps.  This practice can allow information gleaned about a user through one app to be

19   linked to information gleaned about the same user through other apps."[100]

20

21

22

23

24   [99] Federal Trade Commission, *Mobile Apps for Kids: Disclosures Still Not Making the Grade*,
     FTC Staff Report 2012, at 10 n. 25 (citing David Norris, Cracking the Cookie Conundrum with
25   Device ID, AdMonsters (Feb. 14, 2012), *available at* http://www.admonsters.com/blog/cracking-
     cookie-conundrum-device-id (accessed June 4, 2018) ("Device ID technology is the ideal solution
26   to the problem of remembering what a user has seen and what actions he or she has taken: over
     time, between devices and across domains. . . . *Device ID can also help businesses understand
27   visitor behavior across devices belonging to the same person or the same residence.*") (emphasis
     added).
28   [100] *Id.* at 9.

124.    Defendants traffic in the same data identified by the FTC (persistent identifiers such as IDFA/AAID and Device Fingerprint data),[101] causing the same harm identified by the FTC: allowing ad networks to combine data points about child users from a multitude of apps.

125.    The FTC Mobile Apps for Kids Report cautions that it is standard practice—and long has been standard practice—for ad networks, mobile advertisers, and ad middlemen (including, for example, Defendants and their partners and agents) to link the persistent identifiers they acquire with *additional* Personal Data—such as name, address, email address—allowing those entities and their partners to identify individual users whom they profile with indisputable, individual specificity.[102]

126.    Indeed, key digital privacy and consumer groups have described why and how a persistent identifier alone facilitates targeted advertising and challenges – effectively rendering meaningless – any claims of "anonymized" identifiers:

> With the increasing use of new tracking and targeting techniques, any meaningful distinctions between personal and so-called non-personal information have disappeared.  This is particularly the case with the proliferation of personal digital devices such as smart phones and Internet-enabled game consoles, which are increasingly associated with individual users, rather than families.  This means that marketers do not need to know the name, address, or email of a user in order to identify, target and contact that particular user.[103]

127.    A 2014 report by the Senate Committee on Homeland Security and Governmental Affairs entitled "Online Advertising and Hidden Hazards to Consumer Security and Data

---

[101] *See, e.g.*, ¶¶ 83-86 (demonstrating that Upsight transmits, *inter alia*, IDFA/Android ID and AAID and Device Fingerprint data when serving targeted ads to child users); ¶¶ 87-89 (demonstrating that Unity transmits the IDFV/AAID and Device Fingerprint data); ¶¶ 80-82 (demonstrating that Kochava transmits the IDFV and IDFA/AIID and Device Fingerprint data); ¶¶ 99-101 (demonstrating that MoPub transmits the IDFA/AAID and Device Fingerprint data); ¶¶ 93-95 (demonstrating that ScoreCardResearch transmits the AAID and Device Fingerprint data).

[102] *Mobile Apps for Kids: Disclosures Still Not Making the Grade*, *supra* at n.99, at10 n. 25 (citing Jennifer Valentino-DeVries, *Privacy Risk Found on Cellphone Games, Digits Blog*, Wall St. J., Sept. 19, 2011, *available at* http://blogs.wsj.com/digits/2011/09/19/privacy-risk-found-on-cellphone-games/ (noting how app developers and mobile ad networks often use device IDs to keep track of user accounts and store them along with more sensitive information like name, location, e-mail address or social-networking data)).

[103] Comments of The Center for Digital Democracy, et al., FTC, *In the Matter of Children's Online Privacy Protection Rule* at 13-14 (Dec. 23, 2011).

Privacy" amplifies this concern in light of the growth of third-party trackers that operate behind the scenes in routine online traffic:

> Although consumers are becoming increasingly vigilant about safeguarding the information they share on the Internet, many are less vigilant about the plethora of information created about them by online companies as they travel the Internet. *A consumer may be aware, for example, that a search engine provider may use the search terms the consumer enters in order to select an advertisement targeted to his interests. Consumers are less aware, however, of the true scale of the data being collected about their online activity.* A visit to an online news site may trigger interactions with hundreds of other parties that may be collecting information on the consumer as he travels the web. The Subcommittee found, *for example, a trip to a popular tabloid news website triggered a user interaction with some 352 other web servers as well....The sheer volume of such activity makes it difficult for even the most vigilant consumer to control the data being collected or protect against its malicious use.*[104]

128.    A 2012 chart of the mobile digital marketplace,[105] attached hereto as Exhibit A, indicates that hundreds of intermediaries from location trackers to data aggregators to ad networks (and including multiple SDK Defendants in this litigation) "touch" the data that is used to track and profile an individual in a given online transaction.

129.    By 2017, the number of unique companies in this space swelled to almost 5,000, as shown in Exhibit B, attached hereto.[106]

130.    In the course of disclosing Personal Data to select and serve an advertisement (or to conduct any third-party analytics or otherwise monetize user data), the developer and its partner SDKs pass identifying user data to an ever-increasing host of third-parties, who, in turn, may pass along that same data to *their* affiliates.  Each entity may use that data to track users over

---

[104] Staff Report, "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy," Permanent Subcommittee on Investigations of the U.S. Senate Homeland Security and Governmental Affairs Committee, May 15, 2014, at 1 (emphasis added).

[105] Laura Stampler, "This RIDICULOUS Graphic Shows How Messy Mobile Marketing Is Right Now," Business Insider, May 23, 2012, *available at* http://www.businessinsider.com/this-ridiculous-graphic-shows-how-the-insanely-complicated-world-of-mobile-marketing-works-2012-5) (accessed June 4, 2018).

[106] Scott Brinker, "Marketing Technology Landscape Supergraphic" Chief Marketing Technology Blog, May 10, 2017, *available at* https://chiefmartec.com/2017/05/marketing-technology-landscape-supergraphic-2017/) (accessed June 4, 2018).

time and across the Internet, on a multitude of increasingly complex online pathways, with the shared goal of targeting users with advertisements.

131.   The ability to serve targeted advertisements to (or to otherwise profile) a specific user no longer turns upon obtaining the kinds of data with which most consumers are familiar (name, email addresses, etc.), but instead on the surreptitious collection of persistent identifiers, which are used in conjunction with other data points to build robust online profiles.  These persistent identifiers are better tracking tools than traditional identifiers because they are unique to each individual, making them more akin to a social security number.  Once a persistent identifier is sent "into the marketplace," it is exposed to—and thereafter may be collected and used by—an almost innumerable set of third-parties.

132.   Permitting technology companies to obtain children's persistent identifiers exposes those children to targeted advertising.  The ad networks, informed by the surreptitious collection of Personal Data from children, will assist in the sale of advertising placed within the gaming apps and targeted specifically to children.

133.   Defendants exfiltrate children's Personal Data or other information about their online behavior, which is then sold to third-parties, as established above in Sections V.A.-B., who track multiple data points associated with a user's personal identifier, analyzed with the sophisticated algorithms of Big Data to create a user profile, and then used to serve targeted advertising to children whose profiles fit a set of demographic and behavioral traits.

### 2.   Defendants Use Children's Personal Data to Target Them, Despite Children's Heightened Vulnerability to Advertising

134.   Defendants use Disney Gaming App users' Personal Data to serve them targeted ads.  Defendants engage in this behavior despite the known risks associated with and ethical norms surrounding advertising to children.[107]

---

[107]   Kristien Daems, Patrick De Pelsmacker & Ingrid Moons, *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, J. of Marketing Communications (2017) at 13 ("In general, all advertising professionals acknowledge that children are a vulnerable advertising target group.")

135.     Advertisers regard children as valuable advertising targets.[108] Children influence the buying patterns of their families—an influence that amounts to billions of dollars each year—and have lucrative spending power themselves.[109] Children and teens are thus prime targets for advertisers.

136.     Disney intentionally profits from embedding advertising SDKs, to collect and exploit children's Personal Data, including into its mobile games.

137.     Defendants target advertising efforts at children despite widespread awareness that children are more vulnerable to deception by advertisers because they are easily influenced by its content, lack the cognitive skills to understand the intention of advertisers, and can struggle to distinguish between advertisements and other content.[110] This is particularly problematic when using targeted advertising which, by design, more effectively sways target audiences.[111] Research supports that online advertisements pose heightened risks to children.[112]

138.     Exposure to advertising can also lead to negative outcomes for children, including increasing conflict with their parents, cynicism, health issues, and increased materialism.[113]

139.     Children often lack the skills and knowledge necessary to assess and appreciate the risks associated with online data exfiltration and tracking.[114] Even attempts to disclose privacy-

---

[108] Lara Spiteri Cornish, *'Mum, can I play on the Internet?' Parents' understanding, perception, and responses to online advertising designed for children*, 33 Int'l J. Advertising 437, 438 (2014) ("Indeed, in recent years, marketers targeting children have developed a strong online presence . . ."); Issie Lapowsky, "Why Teens are the Most Elusive and Valuable Customers in Tech," Inc., June 2018, *available at* https://www.inc.com/issie-lapowsky/inside-massive-tech-land-grab-teenagers.html (accessed June 4, 2018).

[109] Sandra L. Calvert, *Children as Consumers: Advertising and Marketing*, 18 Future Child 205, 207 (2008).

[110] Xiaomei Cai and Xiaoquan Zhao, *Online Advertising on Popular Children's Websites: Structural Features and Privacy Issues*, 29 Computers in Human Behavior 1510 (2013); *Children as Consumers: Advertising and Marketing*, *supra* at 109; *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, *supra* at 107, at 2 (collecting studies); *'Mum, can I play on the internet?'*, *supra* at 108, at 438-39 (collecting studies).

[111] Olesya Venger, *Internet Research in Online Environments for Children: Readability of Privacy and Terms of Use Policies; The Uses of (Non)Personal Data by Online Environments and Third-Party Advertisers*, 10 Journal of Virtual Worlds Research 1, 8 (2017).

[112] *'Mum, can I play on the Internet?'*, *supra* at 108, at 440-42 (collecting studies).

[113] *Children as Consumers: Advertising and Marketing*, *supra* at 109, at 118-119.

[114] Ilene R. Berson & Michael J. Berson, *Children and their Digital Dossiers: Lessons in Privacy Rights in the Digital Age*, 21 Int'l J. of Social Education 135 (2006).

1   violative behavior are not easily understood.  Research has found that policies explaining the

2   exfiltration and use of children's data are difficult even for adults to understand, and marketers

3   make no effort to explain their targeted marketing practices to child and teen audiences in

4   developmentally appropriate and easy-to-understand ways.[115]  This practice "could mislead these

5   vulnerable emerging consumers into thinking that they are only playing games and their data are

6   not collected for any purpose."[116]

7         **3.     Defendants Exfiltrate and Analyze Users' Personal Data to Track the
              Effect of Their Ads on Users' Behavior**

8

9         140.    Defendants exfiltrate and analyze users' Personal Data before and after serving

10  advertisements.  On the front end, the data helps them know what ads to serve (based on users'

11  demographics and behaviors).  On the back end, the data helps them determine whether the ad is

12  successful in affecting children's behavior.  This is called ad attribution.

13        141.    Defendants track the impact and value of rewarded videos and other ads by

14  tracking users' activities across the Internet after they interact with those ads.

15        142.    SDK Defendants want to reward advertisers whose ads influenced child users'

16  behavior.  But such attribution requires surveillance.  For example, if 10-year-old Sally is served

17  an ad for a pony game based on her age, implied income, and online activities, and later goes and

18  downloads that pony game, the advertiser responsible for the pony game ad wants that download

19  attributed to them, so that they can get paid for that action.  But the only way for the advertising

20  companies to connect the Sally that saw the ad with the Sally that downloaded the app is to track

21  Sally's online activities after she was shown the ad—such as by tracking her persistent identifier.

22        143.    The SDK Defendants market their ability to offer ad attribution services through

23  their SDKs.  For example:

24

25

26

27  _____
    [115] *Internet Research in Online Environments for Children*, *supra* at 111, at 9.
28  [116] *Id.* at 10.

a.      Upsight states that it can "Measure the effectiveness of [ad] campaigns by analyzing impressions, clicks, and conversion" so that developers and advertisers can "see which campaigns produce desired behaviours and which ones don't."[117]

b.      Kochava markets that "attribution is one of the most powerful tools at an advertiser's disposal."[118]  Kochava further states that it provides attribution services "[b]y considering every available data point (impressions, clicks, installs and events) before determining the winning engagement. . ."[119] It markets that it collects "device information when an impression is served or a user clicks on an advertisement served by a network.  Each of these engagements are eligible for attribution.  This collected device information ranges from unique device identifiers to the IP address of the device at the time of click or impression. . ."[120]

144.    Defendants exfiltrate Plaintiffs' and Class Members' children's Personal Data from their devices in order to target them for advertising based on their behavior, demographics, and location.  Defendants continue to track Plaintiffs' children via their Personal Data after ads are shown in order to monitor their behavior into the future, and analyze whether and how it was influenced by those same targeted ads.  This ongoing exfiltration, tracking, and analysis violate Plaintiffs' children's privacy and exploit their vulnerabilities as children.

**4.      Defendants Use Personal Data to Encourage Children to Continue Using the App, Increasing the Risks Associated with Heightened Mobile Device Usage**

145.    Defendants, and third-party advertisers, benefit from increased mobile device usage among children.  The longer and more often a child plays Disney's games, the more Personal Data about that child the Defendants can exfiltrate and commercialize.  Particularly for

---

[117] "Integrated Web & Mobile Marketing," Upsight, *available at* https://www.upsight.com/marketing/ (accessed June 4, 2018).
[118] "Configurable Attribution," Kochava, *available at* https://www.kochava.com/configurable-attribution/ (accessed June 4, 2018).
[119] *Id.*
[120] "Attribution Overview," Kochava, *available at* https://support.kochava.com/reference-information/attribution-overview (accessed June 4, 2018).

free apps, this increased opportunity to exfiltrate and monetize children's Personal Data and expose them to advertising is critically important to Defendants.[121]

146. The mobile advertising ecosystem does not simply benefit from increasing app use and mobile device addiction, it actively feeds it. Defendants and their advertising partners use user's Personal Data to program their apps to "hook" users, and to keep them playing the app.[122] A key service marketed by the SDK Defendants is their ability to use marketing to retain app users, i.e., to keep users playing an app.[123] The SDK Defendants market their ability to help app developers such as Disney increase user retention, and thereby their profits.[124]

147. The SDK Defendants' retention services are fueled by user data. To enhance retention, the SDK Defendants use users' Personal Data to analyze their demographics and behavior, and trigger events—both within the App and across the Internet—that will encourage them to play the App more often and for longer periods. For example:

a. Upsight encourages developers to "[u]nderstand user behavior and take immediate action to achieve your goals."[125] The graphic below, from Upsight's blog, shows how Upsight tracks individual users – and their behaviors on the app – to "deliver the right offers to the right users":[126]

---

[121] "Your phone is trying to control your life," PBS News Hour, *available at* https://www.youtube.com/watch?v=MacJ4p0vITM (accessed June 4, 2018).

[122] 60 Minutes, "Brain Hacking," *available at* https://www.youtube.com/watch?v=awAMTQZmvPE (accessed June 4, 2018); Nicholas Kardaras, Glow Kids 123-124 (2016), at XVIII-XIX, 22, 32.

[123] *See, e.g.*, "Marketing," Upsight, *available at* https://www.upsight.com/marketing/ (marketing the Upsight SDK's ability to "boost retention") (accessed June 4, 2018).

[124] *Id.*

[125] "Homepage," Upsight, *available at* https://www.upsight.com/ (accessed June 4, 2018); *see also* "Analytics," Upsight, *available at* https://www.upsight.com/analytics/ (accessed June 4, 2018).

[126] "Increasing Conversion with User Experience Management," Upsight Blog, May 16, 2016, *available at* http://blog.upsight.com/blog/how-uxm-can-increase-conversion (accessed June 4, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD



*Figure 4*

b.      Kochava's retention tool allows developers to sort and analyze users' Personal Data by myriad different categories in order to see "a visualization of the retention of Installs, RPU (Revenue per User), Revenue, and events for a selected timeframe."[127]  Developers can see how successful they were at retaining users by app, by device data (including type and carrier), events, and location.[128]  Kochava also markets that it keeps users' Personal Data "in perpetuity" so that it can "recognize[] when dormant users return to the app or when users, who have deleted an app, reinstall regardless of the timing."[129]

c.      Unity states that it provides tools to help developers "understand  [their] audience and get actionable insights into [their] players' behavior" and markets that "[w]ith the right insights, [developers] can then improve [their] players' gaming experience to boost retention, engagement and monetization."[130]  It further markets its ability to "[d]eliver dynamic experiences fueled by data insight" based on "individual behavior and traits."[131]  These "dynamic experiences" are fueled by users' Personal Data:

---

[127] "Analytics Retention," Kochava, *available at* https://support.kochava.com/analytics-reports-api/analytics-overview/analytics-retention (accessed June 4, 2018)
[128] *Id.*
[129] "Data Retention," Kochava, *available at* https://www.kochava.com/data-retention/ (accessed June 4, 2018).
[130] "What is Unity Analytics," Unity, April 6, 2016, *available at* https://support.unity3d.com/hc/en-us/articles/209878373-What-is-Unity-Analytics- (accessed June 4, 2018).
[131] "Analytics," Unity, *available at* https://unity.com/solutions/analytics (accessed June 4, 2018).

1

2

> Access data insights across all devices. Track player behaviors specific to your app. Analyze user behavior the way you want. Act upon the insights in real-time to customize user experiences.[132]

3    148.   Defendants exfiltrate Disney Gaming App users' Personal Data—including

4  Plaintiffs' Children's Personal Data—from their devices and use it for tracking and targeting to

5  entice users to play the App longer and more often.  Defendants use sophisticated algorithms to

6  determine whether and when to target users with specific in-app cues or out-of-app ads.  This

7  behavior increases Defendants' revenue, all the while violating Plaintiffs' children's privacy and

8  exposing them to the negative outcomes associated with increased mobile device usage by

9  children.

10    149.   Defendants' "retention" efforts take place in a context where mobile device usage

11  among children is widespread and growing.  As of 2017, 95% of families with children younger

12  than 8-years-old had a smartphone, and 78% had a tablet.[133]  The proportion of homes with a

13  tablet has nearly doubled over the past four years.[134]  Often, children have their own devices; as

14  of 2017, 45% of children younger than 8-years-old had their own mobile device, up from only 3%

15  in 2011 and 12% in 2013.[135]

16    150.   Children spend increasingly more time on mobile devices.  On average, a child

17  younger than 8-years-old spends 48 minutes every day on a mobile device, more than four times

18  the average time spent in 2013,[136] while children between the ages of eight and twelve spend 141

19  minutes on mobile devices and teens spend 252 minutes.[137]  Mobile games are popular among

20  children, second only to watching TV or videos.[138]  Children younger than 8-years-old spend an

21

---

22  [132] *Id.*

23  [133] Victoria Rideout, "The Common Sense Census: Media Use By Kids Age Zero To Eight," Common Sense Media, at 3 (2017), *available at* https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-kids-age-zero-to-eight-2017.

24  [134] *Id.* at 23

25  [135] *Id.*

26  [136] *Id.* at 3

[137] Victoria Rideout, "The Common Sense Census: Media Use by Tweens and Teens," Common Sense Media, at 21 (2015), *available at* https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-tweens-and-teens (accessed June 4, 2018).

27

28  [138] Media Use By Kids Age Zero To Eight, *supra* at 133, at 23

1   average of 16 minutes every day gaming, more than doubling since 2013.[139]  Twenty-seven

2   percent of children ages 8 to 18 report playing mobile games every day,[140] and those who play

3   games average about 70 minutes *every day* doing so.[141]

4          151.    As the use of mobile devices rises, so too do awareness of and concern about the

5   effects of this use on children.[142]  The consequences of mobile device overuse, particularly among

6   children, is well-known in the tech industry,[143] with many industry leaders refusing to allow their

7   own children to own or use devices,[144] or attend schools where such mobile devices are prevalent.

8          152.    In a recent study, forty percent of parents of 5- to 8-year-olds reported difficulty

9   getting their children to turn off mobile devices.[145]  Fifty-three percent of teens and 72% of kids

10  age 8-12 report conversations with their parents about how much time they spend on mobile

11  devices.[146]  Parents are increasingly concerned about their children's mobile device usage, and for

12  good reason: research has associated increasing usage with negative consequences for children,[147]

13  _____

14  [139] *Id.* at 31

    [140] Media Use by Tweens and Teens, *supra* at 137, at 15

15  [141] *Id.* at 24

16  [142] *See, e.g.*, *Online Advertising on Popular Children's Websites: Structural Features and Privacy Issues*, *supra* at n. 110, at 1510-18 (collecting studies); Barry Rosenstein and Anne

17  Sheehan, "Open letter from JANA Partners and CALSTRS to Apple Inc.," Jan. 6, 2018, *available at* https://thinkdifferentlyaboutkids.com/index.php?acc=1 (accessed June 4, 2018) (letter to Apple

18  citing "growing body of evidence" that increasing mobile device use leads to "unintentional negative consequences" for young users).

    [143] *See, e.g.*, Farhad Manjoo, "It's Time for Apple to Build a Less Addictive iPhone," New York

19  Times, Jan. 17, 2018, *available at* https://www.nytimes.com/2018/01/17/technology/apple-addiction-iphone.html (accessed June 4, 2018) ("Tech 'addiction' is a topic of rising national

20  concern."); Thuy Ong, "Sean Parker on Facebook: 'God only knows what it's doing to our children's brains'," The Verge, Nov. 9, 2017, *available at*

21  https://www.theverge.com/2017/11/9/16627724/sean-parker-facebook-childrens-brains-feedback-loop (accessed on June 4, 2018) (former tech industry leader recognizing that app creators

22  intentionally "exploit[] human psychological vulnerabilities" to increase app engagement).
    [144] Nick Bilton, "Steve Jobs Was a Low-Tech Parent," New York Times, Sept. 10, 2014,

23  *available at* https://www.nytimes.com/2014/09/11/fashion/steve-jobs-apple-was-a-low-tech-parent.html (accessed on June 4, 2018); Claudia Dreifus, "Why We Can't Look Away From Our

24  Screens," New York Times, March 6, 2017, *available at* https://www.nytimes.com/2017/03/06/science/technology-addiction-irresistible-by-adam-

25  alter.html (accessed on June 4, 2018).
    [145] Media Use By Kids Age Zero To Eight, *supra* at 133, at 41

26  [146] Media Use by Tweens and Teens, *supra* at 137, at 71

27  [147] Ryan M. Atwood et al., Adolescent Problematic Digital Behaviors Associated with Mobile Devices, 19 North American J. Psychology 659-60 (2017) (collecting studies); *Id.* at 672-73

28  (finding that more than 82.5% of teens were classified as over-users of the Internet, and finding

such as increasing rates of ADHD,[148] depression,[149] anxiety,[150] and reduced focus in the classroom.[151]  One recent study showed that children between the ages of 12 and 18 who spent more time playing games had lower average social-emotional well-being.[152]

153.    Most parents believe that children are better off spending less time on their mobile devices.[153]  Three out of four parents are worried about their children's use of screen devices.[154]  A recent study showed that 67% of parents of children under age 8 worry about companies collecting data about their children through media, while 69% are concerned about too much advertising.[155]

## F.    State Privacy Laws Protect Children and Their Parents from Privacy-Invasive Tracking, Profiling, and Targeting of Children Online.

154.    "Invasion of privacy has been recognized as a common law tort for over a century."  *Matera v. Google Inc*., 15-CV-04062, 2016 WL 5339806, at * 10 (N.D. Cal, Sept. 23, 2016) (citing Restatement (Second) of Torts §§ 652A-I for the proposition "that the right to privacy was first accepted by an American court in 1905, and 'a right to privacy is now recognized in the great majority of the American jurisdictions that have considered the question'").  As Justice Brandeis explained in his seminal article, *The Right to Privacy*, "[t]he common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others."  Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 198 (1890).  The Second Restatement of Torts recognizes the same privacy rights through its tort of intrusion upon seclusion, explaining that "[o]ne who intentionally intrudes, physically or otherwise, upon the

---

that mobile device usage increased Internet usage).
[148] Glow Kids, *supra* at 122, at 123-124
[149] *Id.* at 127
[150] *Id.*; "Brain Hacking," *supra* at 122
[151] Glow Kids, *supra* at 148, at 123
[152] Media Use by Tweens and Teens, *supra* at 137, at 79
[153] Media Use By Kids Age Zero To Eight, *supra* at 133, at 39
[154] *Id.* at 42
[155] *Id.*

solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other

for invasion of his privacy."  Restatement (Second) of Torts § 652B (1977).  The Supreme Court

has similarly recognized the primacy of privacy rights, explaining that the Constitution operates

in the shadow of a "right to privacy older than the Bill of Rights."  *Griswold v. Connecticut*, 381

U.S. 479, 486 (1965).  For its part, California amended its constitution in 1972 to specifically

enumerate a right to privacy in its very first section.  *See* Cal. Const. Art. I, § 1.  And the

California Supreme Court has recognized the fundamental injuries at stake in privacy violations,

explaining as follows:

> [A] measure of personal isolation and personal control over the
> conditions of its abandonment is of the very essence of personal
> freedom and dignity . . . A [person] . . . whose conversations may
> be overhead at the will of another . . . is less of a [person], has less
> human dignity, on that account. He who may intrude upon another
> at will is the master of the other and, in fact, intrusion is a primary
> weapon of the tyrant.

*Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998) (quoting Edward J. Bloustein,

*Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. REV. 962,

973-74 (1964)); *see also Gill v. Curtis Pub. Co.*, 38 Cal. 2d 273, 276 (1952) ("Recognition has

been given of a right to privacy, independent of the common rights to property, contract,

reputation and physical integrity... In short, it is the right to be let alone.") (internal quotation

marks omitted).

### 1. Defendants' Surreptitious and Deceptive Collection of Personal Data Violates Plaintiffs' Reasonable Expectations of Privacy and is Highly Offensive.

155.    A reasonable person believes that Defendants' conduct, described above, violates

Plaintiffs' and their children's expectations of privacy.

156.    A survey conducted by the Center for Digital Democracy ("CDD") and Common

Sense Media of more than 2,000 adults found overwhelming support for the basic principles of

privacy embedded in state common law, as well as federal law.[156]  The parents who were polled

responded as follows when asked whether they agreed or disagreed with the following statements:

---

[156] Center for Digital Democracy, "Survey on Children and Online Privacy, Summary of Methods

a.     "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content."

> • 5 percent strongly agree
> • 3 percent somewhat agree
> • 15 percent somewhat disagree
> • **75 percent strongly disagree**
> • 3 percent do not know or refused to answer

b.     "As long as advertisers don't know a child's name and address, it is okay for them to collect and use information about the child's activity online."

> • 3 percent strongly agree
> • 17 percent somewhat agree
> • 10 percent somewhat disagree
> • **69 percent strongly disagree**
> • 1 percent do not know or refused to answer

c.     "It is okay for advertisers to collect information about a child's location from that child's mobile phone."

> • 6 percent strongly agree
> • 3 percent somewhat agree
> • 7 percent somewhat disagree
> • **84 percent strongly disagree**
> • less than 1 percent do not know or refused to answer

d.     "Before advertisers put tracking software on a child's computer, advertisers should receive the parent's permission."

> • **89 percent strongly agree**
> • 5 percent somewhat agree
> • 2 percent somewhat disagree
> • 4 percent strongly disagree
> • less than 1 percent do not know or refused to answer

e.     When asked, "There is a federal law that says that online sites and companies need to ask parents' permission before they collect personal information from children under age 13. Do you think the law is a good idea or a bad idea?" 93 percent said it was a good idea, 6 percent said it was a bad idea, and 1 percent did not know or refused to answer.

---

and Findings," *available at* http://www.centerfordigitaldemocracy.org/sites/default/files/COPPA%20Executive%20Summary%20and%20Findings.pdf.

1    f.    Non-parent adults tended to answer in the same way, although parents were

2 more protective of their children's privacy.

3    157.    In a 2013 primer designed for parents and kids to understand their privacy rights

4 online, the CDD noted similar findings:[157]

5    a.    Ninety-one percent of both parents and adults believe it is not okay for

6 advertisers to collect information about a child's location from that child's mobile phone.

7    b.    Ninety-six percent of parents and 94% of adults expressed disapproval

8 when asked if it is "okay OK [sic] for a website to ask children for personal information about

9 their friends."

10    c.    Ninety-four percent of parents, as well as 91% of adults, believe that

11 advertisers should receive the parent's permission before putting tracking software on a child's

12 computer.

13    158.    In a Pew Research Center study, nearly 800 Internet and smartphone users were

14 asked the question, "how much do you care that only you and those you authorize should have

15 access to information about where you are located when you use the Internet?"  Fifty-four percent

16 of adult Internet users responded "very important," 16% responded "somewhat important," and

17 26% responded "not too important."[158]

18    159.    According to the same study, "86% of Internet users have tried to be anonymous

19 online and taken at least one step to try to mask their behavior or avoid being tracked."  For

20 example, 64% percent of adults claim to clear their cookies and browser histories in an attempt to

21 be less visible online.

22    160.    Smartphone owners are particularly active when it comes to these behaviors. Some

23 50% of smartphone owners have cleared their phone's browsing or search history, while 30%

24 have turned off the location tracking feature on their phone due to concerns over who might

---

[157] *See* Center for Digital Democracy, "The New Children's Online Privacy Rules: What Parents
Need to Know," 6 (June 2013),
https://www.democraticmedia.org/sites/default/files/CDDCOPPAParentguideJune2013.pdf.

[158] Lee Rainie, et al., "Anonymity, Privacy, and Security Online," Pew Research Center 7, Sept.
5, 2013, *available at* http://pewinternet.org/Reports/2013/Anonymity-online.aspx (accessed June
4, 2018).

access that information.[159]  Such behaviors exemplify people's expectation that their personal information—including their location—not be tracked by others online.

161.   In another study by the Pew Research Center on the Internet and American Life, respondents were asked, "Which of the following statements comes closest to exactly how you, personally, feel about targeted advertising being used online—even if neither is exactly right?" Sixty-eight percent said, "I'm not okay with it because I don't like having my online behavior tracked and analyzed."  Twenty-eight percent said, "I'm okay with it because it means I see ads and get information about things I'm really interested in."[160]  Thus, more often than not, attitudes toward data collection for use in targeted advertising are negative.

162.   A survey of 802 parents and their age 12- to17-year-old teenage children showed that "81% of parents of online teens say they are concerned about how much information advertisers can learn about their child's online behavior, with some 46% being 'very' concerned."[161]

163.   A study comparing the opinions of young adults between the ages of 18 to 23 with other typical age categories (25-34, 35-44, 45-54, 55-64, and 65+) found that a large percentage is in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions.[162]  For example, 88% of young adults surveyed responded that "there should be a law that requires websites and advertising companies to delete all stored information about an individual"; for individuals in the 45-54 age range, 94% approved of such a law.

---

[159] Jan Lauren Boyles, et al., "Privacy and Data Management on Mobile Devices," Pew Research Center, Sept. 5, 2012, *available at* http://www.pewinternet.org/files/old-media//Files/Reports/2012/PIP_MobilePrivacyManagement.pdf (accessed June 4, 2018).

[160] Kristen Purcell, et al., "Search Engine Use," Pew Research Center 2012, *available at* http://www.pewinternet.org/files/old-media/Files/Reports/2012/PIP_Search_Engine_Use_2012.pdf (accessed June 4, 2018).

[161] Mary Madden, et al., "Parents, Teens, and Online Privacy," Pew Research Center 2, Nov. 14, 2012, *available at* http://www.pewinternet.org/files/old-media//Files/Reports/2012/PIP_ParentsTeensAndPrivacy.pdf (accessed June 4, 2018).

[162] Chris Hoofnagle, et al., "How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies?," Apr. 14, 2010, *available at* http://ssrn.com/abstract=1589864.

164.   The same study noted that "[o]ne way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them." A majority of the 18-24 year olds polled selected the highest dollar amount of punishment ("more than $2,500") in response to how a company should be fined if it purchases or uses someone's personal information illegally; across all age groups, 69% of individuals opted for the highest fine.  Finally, beyond a fine, around half of the sample (across all age groups) chose the harshest penalties for companies using a person's information illegally: putting them out of business and jail time.

165.   Another study's "findings suggest that if Americans could vote on behavioral targeting today, they would shut it down."  The study found that 66% of one thousand polled individuals over the age of 18 did not want online advertisements tailored for them, and that when the same individuals were told that such advertising was "based on following them on other websites they have visited," the percentage of respondent rejecting targeted advertising shot up to 84%.[163]

166.   Even when consumers are told that online companies will follow them "anonymously," Americans are still averse to this tracking:  68% definitely would not allow it, and 19% would probably not allow it.

167.   The study found that 55% of 18-24 year old Americans rejected tailored advertising when they were not informed about the mechanics of such advertising.  As with the general sample, the percentage of rejections shot up to 67% when those 18-24 year olds were informed that tailored advertising was based on their activities on the website they are visiting, and then 86% when informed that tailored ads were based on tracking on "other websites" they had visited.  Despite the overwhelming aversion to targeted advertising, these findings suggest that public concern about privacy-intrusive targeted advertising is *understated* based on the fact that the public may not fully understand how a targeted advertisement is delivered.  When

---

[163] Joseph Turow, et al., "Contrary to What Marketers Say, Americans Reject Tailored Advertising and Three Activities that Enable It," Sept. 29, 2009, *available at* http://ssrn.com/abstract=1478214.

properly understood by consumers, targeted advertising, and the tracking and profiling in the background, is decried across all age groups.

168.   A survey on consumer expectations in the digital world, conducted by Deloitte's Technology, Media & Telecommunications practice[164] and based on polling conducted in 2017 of 2,088 individuals (from the following age groups: ages 14-20 (born 1997–2003); ages 21–34 (born 1983–1996); ages 35-51 (born 1966-1982); ages 52-70 (born 1947-1965); ages 71+ (born 1946 or earlier) found:

    a.   Seventy-three percent of all U.S. consumers indicated they were concerned about sharing their personal data online and the potential for identity theft.

    b.   In 2017, there was a 10-point drop in willingness to share Personal Data in exchange for personalized advertising (from 37% to 27%).

    c.   The reason for the sudden change in U.S. consumers' attitudes is they overwhelmingly lack confidence in companies' ability to protect their data:  69% of respondents across generations believe that companies are not doing everything they can to protect consumers' Personal Data.

    d.   Seventy-three percent of all consumers across all generations said they would be more comfortable sharing their data if they had some visibility and control.  In addition, 93% of U.S. consumers believe they should be able to delete their online data at their discretion.

169.   In the same vein, one news organization recently summarized a *Journal of Consumer Research* article capturing society's discomfort with and feelings of revulsion toward the practice of targeted advertising and the data exfiltration required:  "There's something unnatural about the kind of targeting that's become routine in the ad world, this paper suggests, something taboo, a violation of norms we consider inviolable — it's just harder to tell they're being violated online than off.  But the revulsion we feel when we learn how we've been

---

[164] Kevin Westcott, et al., "Digital Media Trends Survey: A New World of Choice for Digital Consumers," Center for Technology, Media & Telecommunications, 12th ed., 2018, *available at* https://www2.deloitte.com/content/dam/insights/us/articles/4479_Digital-media-trends/4479_Digital_media%20trends_Exec%20Sum_vFINAL.pdf.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

1    algorithmically targeted, the research suggests, is much the same as what we feel when our trust
2    is betrayed in the analog world."[165]

3        170.    By collecting and sharing Plaintiffs' children's Personal Data in order to assist in
4    profiling and tracking them across multiple online platforms, and failing to obtain Plaintiffs'
5    permission, Defendants have breached Plaintiffs' expectations of privacy.

6        171.    Various other sources provide manifestations of society's deep revulsion toward
7    companies' collecting personal information for tracking and profiling purposes:

8              a.    Legislative enactments reflect society's growing concern for digital
9    privacy. For example, California's Shine the Light Law, Cal. Civ. Code § 1798.83, provides that
10   companies that share a user's personal information with a third-party for direct marketing
11   purposes must disclose to consumers, upon request, the category of personal information that is
12   shared and the identities of the third-parties receiving the personal information.  The California
13   Online Privacy Protect Act of 2003, Cal. Bus. & Prof. Code § 22575, provides that an operator of
14   an online service that collects "personally identifiable information" must provide notice in a
15   public privacy policy to California consumers of, *inter alia*, any categories of such information
16   collected and whether other parties may collect such information "overtime and across different
17   Web sites" when a consumer uses the operator's service.

18             b.    Scholarly literature about the evolution of privacy norms recognizes
19   society's expectation of determining for oneself when, how, and the extent to which information
20   about one is shared with others.

21             c.    Self-regulation agencies in the online advertising industry note the
22   American consumers' reasonable concern with online privacy (92% of Americans worry about
23   their online data privacy) and that the top causes of that concern include Defendants conduct at
24   issue here: companies collecting and sharing personal information with other companies.[166]

25   _____

26   [165] Sam Biddle, "You Can't Handle the Truth about Facebook Ads, New Harvard Study Shows,"
     The Intercept, May 9, 2018, *available at* https://theintercept.com/2018/05/09/facebook-ads-
     tracking-algorithm/?utm_source=digg&utm_medium=email (accessed June 4, 2018).
27   [166] "Data Privacy is a Major Concern for Consumers," TrustArc Blog, Jan. 28, 2015, *available at*
     https://www.trustarc.com/blog/2015/01/28/data-privacy-concern-consumers/ (accessed June 4,
28   2018).

1

2. **Defendants' Breach of Privacy Norms Is Compounded by Defendants' Targeting, Tracking, and Profiling of Children.**

2

3

172.    Defendants' unlawful intrusion into users' privacy is made even more egregious

4

and offensive by the fact that Disney and its SDK partners have targeted and collected *children*'s

information, without obtaining parental consent.

5

6

173.    Parents' interest in the care, custody, and control of their children is perhaps the

oldest of the fundamental liberty interests recognized by society.  The history of Western

7

civilization reflects a strong tradition of parental concern for the nurture and upbringing of

8

9

children in light of children's vulnerable predispositions.  Our society recognizes that parents

should maintain control over who interacts with their children and how, in order to ensure the safe

10

and fair treatment of their children.

11

174.    Because children are more susceptible to deception and exploitation than adults,

12

society has recognized the importance of providing added legal protections for children, often in

13

the form of parental consent requirements.

14

15

175.    By way of example, American society has expressed heightened concern for the

exploitation of children in numerous ways:

16

a.    At common law, children under the age of eighteen do not have full

17

18

capacity to enter into binding contracts with others.  The law shields minors from their lack of

judgment, cognitive development, and experience.

19

20

b.    Under state law, children are frequently protected via parental consent

requirements.  Cal. Civ. Code § 3344 requires "the prior consent of [a] parent or legal guardian"

21

22

in order for a person to use the name or likeness of a minor under the age of eighteen for

advertising purposes.  The California Education Code does not allow access to Personal Data

23

24

collected from students without parental consent.  Cal. Educ. Code § 49076(a).  Various bills

pending in California's State Congress seek to protect parental autonomy over children engaged

25

in online activities.

26

c.    State laws also outright ban certain forms of targeted advertising to

27

28

children.  The California Student Online Personal Information Protection Act ("SOPIPA")

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

1    requires operators of mobile applications marketed for use in K-12 schools not engage in

2    "targeted advertising," "amass a profile" of children, or sell children's information, based upon

3    any information, including "persistent unique identifiers" (including geolocation), that the

4    operator acquires via the mobile app.

5            d.      The California Privacy Rights for California Minors in the Digital World

6    Act similarly reveals society's concern with the ability of sophisticated ad tech companies to

7    exploit minors under the age of eighteen through targeted advertising, and thus bans certain types

8    of targeted advertising.  The Act was passed in part as a response to the surreptitious manner in

9    which companies could exploit children's information:  "[w]eb sites and online advertising

10   networks often use persistent identification systems - like a cookie in a person's browser, the

11   unique serial number on a mobile phone, or the I.P. address of a computer - to collect information

12   about a user's online activities and tailor ads for that person."

13           e.      At the federal level, the Children's Online Privacy Protection Act

14   ("COPPA"), protects, *inter alia*, children's Personal Data from being collected and used for

15   targeted advertising purposes without parental consent, and reflects a clear nationwide norm

16   about parents' expectations to be involved in how companies profile and track their children

17   online.

18           f.      Under the federal Family Educational Rights and Privacy Act of 1974,

19   students have a right of privacy regarding their school records, but the law grants parents a right

20   to access and disclose such records.  20 U.S.C. § 1232g(a)(4).

21        176.    Legislative commentary about the need for federal law to provide protections for

22   children provides another expression of society's expectation that companies should not track

23   *children* online without obtaining parental consent.  For example, when discussing the need for

24   federal legislation to protect children's privacy—which eventually led to Congress passing

25   COPPA—Senator Richard Bryan (the primary author of the COPPA bill) stated:  "Parents do not

26   always have the knowledge, the ability, or the opportunity to monitor their children's online

27   activities, and that is why Web site operators should get parental consent prior to soliciting

28   personal information.  The legislation that Senator McCain and I have introduced will *give*

*parents the reassurance that when our children are on the Internet they will not be asked to give out personal information to commercial Web site operators without parental consent.*[167]

177.    The advertising industry's own privacy standards, and the self-regulatory agencies which serve it, also support enhanced protections for children online, including obtaining parental consent.

178.    For example, a survey of professionals in the advertising industry found that a "substantial majority of the respondents [advertising professionals] (79%) agrees that the collection of personal information of children should be prohibited," and over "[h]alf of the advertisers (56.8%) agrees with this statement if teenagers are concerned."[168]

179.    Further, "[t]he majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%)."

180.    In the same vein, the Children's Advertising Review Unit, an arm of the advertising industry's self-regulation branch, recommends that companies take the following steps, *inter alia*, to meet consumers' reasonable expectations of privacy and avoid violating the law:[169]

  a.    Advertisers have special responsibilities when advertising to children or collecting data from children online.  They should take into account the limited knowledge, experience, sophistication and maturity of the audience to which the message is directed.  They should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are being subject to advertising.

---

[167] *S. 2326: Children's Online Privacy Protection Act of 1998*, Hearing before Senate Subcommittee on Communications, S. Hrg. 105-1069, at 4 (Sept. 23, 1998) (Statement of Sen. Bryan) (emphasis added).

[168] *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, *supra* at 107, at 2.

[169] Children's Advertising Review Unit, *Self-Regulatory Program for Children's Advertising* (2014), *available at* http://www.asrcreviews.org/wp-content/uploads/2012/04/Self-Regulatory-Program-for-Childrens-Advertising-Revised-2014-.pdf.

b.      Operators should disclose passive means of collecting information from children (*e.g.*, navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

c.      Operators must obtain "verifiable parental consent" before they collect, use or disclose personal information to third-parties, except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.

d.      To respect the privacy of parents, operators should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time.

e.      Operators should ask screening questions in a neutral manner so as to discourage inaccurate answers from children trying to avoid parental permission requirements.

f.      Age-screening mechanisms should be used in conjunction with technology (*e.g.*, a session cookie) to help prevent underage children from going back and changing their age to circumvent age-screening.

181.    By failing to (1) obtain parental consent, (2) disclose to parents the nature of their data collection practices, and (3) take other steps to preclude children from accessing apps that surreptitiously capture their Personal Data, Defendants have breached parents' and their children's reasonable expectation of privacy, in contravention of privacy norms that are reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

**G.      Disney's Omissions and Misrepresentations Create the False Impression That Its Apps Are Compliant with Privacy Laws and Norms.**

182.    Disney markets Princess Palace Pets and the Where's My Water? Apps as suitable for children, both explicitly (through public-facing representations) and implicitly (through the game's content, design, and distribution channels).

183.    However, despite such representation—and despite having indisputable knowledge that children play on these apps—Disney omits any mention of the privacy-invasive collection of

Personal Data by the SDKs embedded within the apps; and indeed makes affirmative misrepresentations regarding the collection of children's Personal Data.

184.   Such omissions and misrepresentations create the false impression that Princess Palace Pets and the Where's My Water? Apps conform to established norms regarding children's privacy, and that Disney's and SDK Defendants' behavior respect those norms.

### 1. Disney Markets Princess Palace Pets and the Where's My Water? Apps as Suitable for Children and in Compliance With All Applicable Privacy Laws and Norms.

185.   Disney expressly designed Princess Palace Pets and the Where's My Water? Apps to be played by minor children.

186.   Indeed, Princess Palace Pets and the Where's My Water? Apps are gaming apps whose subject matter, design, and distribution mechanisms all suggest that the apps are appropriate for children.

### a. Princess Palace Pets

187.   Princess Palace Pets is a game in which players are tasked with taking care of the pets of various Disney princesses.  Per the game's description, children playing the game are encouraged to "[e]nter the enchanted world of the Disney Princess Palace Pets.  Meet Pumpkin, Teacup, Blondie, Treasure, Berry, Beauty, Lily, Summer, Sultan, and Petit! These adorable pets are all different, but each one loves to be cared for and can't wait to go on new adventures with you. Learn how the pets met the princesses, find out their unique talents, and treat them to a delightful day at the Royal Pet Salon!"[170]  Below is a screenshot from the game:

---

[170] "Designed for Families: Program Requirements," Google Play, *available at* https://play.google.com/about/families/designed-for-families/program-requirements/ (accessed June 4, 2018).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



*Figure 5*

17

      **b.**    <u>**Where's My Water?**</u>

18
     188.    Where's My Water? is a puzzle game in which players must help a cartoon

19
alligator named "Swampy" to re-direct a subterranean water flow in order to let Swampy take a

20
shower.  Per the app's description, players are encouraged to "[h]elp Swampy by guiding water to

21
his broken shower. Each level is a challenging physics-based puzzle with amazing life-like

22
mechanics. Cut through dirt to guide fresh water, dirty water, toxic water, steam, and ooze

23
through increasingly challenging scenarios! Every drop counts!"[171]  Below is a screenshot from

24
the game:

25
26
27

28

---

[171] "Where's My Water?," Google Play, *available at*
https://play.google.com/store/apps/details?id=com.disney.WMW (accessed June 4, 2018).

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-04419-JD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



*Figure 6*

18
### c.      Where's My Water? Free/Lite

19      189.    Where's My Water? Free and Where's My Water? Lite are, respectively, the

20 Android and Apple free versions of Where's My Water?.  The descriptions of the game, the

21 placement in the app stores, and the general game play, are identical in all material respects.

22
### d.      Where's My Water? 2

23      190.    Where's My Water? 2 is the sequel to Where's My Water? and, as one might

24 expect, involves directing water to Swampy the alligator so that he may take a shower.  Per

25 Disney, "[t]he sequel to the most addicting physics-based puzzler from Disney has finally arrived.

26 Where's My Water? 2 launches with three brand new locations including the Sewer, the Soap

27 Factory, the Beach. Best of all, the puzzles are all free! Cut through dirt, and guide fresh water,

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

purple water, and steam to help Swampy and his friends!"[172]  Below is a screenshot from the game:



*Figure 7*

191.    In the Apple App Store and Google Play Store, Princess Palace Pets and each of the Where's My Water? Apps are rated as being appropriate for children.  In marketing Princess Palace Pets and the Where's My Water? Apps as being suitable for children, Disney implicitly and explicitly purports to acknowledge and adhere to privacy-protective norms.

192.    For example, Princess Palace Pets, Where's My Water? and Where's My Water? Free are featured in the "Family" section of the Google Play Store, which claims to "give [an app and its developer] improved visibility to parents."[173]  Google states that being included in the Family section of the Google Play Store:

[172] "Where's My Water? 2," Google Play, *available on* https://play.google.com/store/apps/details?id=com.disney.wheresmywater2_goo (accessed June 4, 2018).
[173] "Designed for Families," Google Play, *available at* https://developer.android.com/distribute/google-play/families (accessed June 4, 2018).

1

2

3

> [E]xpands the visibility of your family content on Google Play, helping parents easily find your family-friendly apps and games throughout the store. Other features create a trusted environment that empowers parents to make informed decisions and engage with your content.[174]

4      193.    As described above, it is critical that apps in the Family section are, in fact,

5    "family-friendly" and contribute to a "trusted environment."  Thus, in order to be featured in the

6    Family section of Google Play, Google requires that the app (here, Princess Palace Pets and the

7    Where's My Water? Apps) be a part of the "Designed for Families" program,[175] which comes

8    with specific requirements.

9      194.    In order for Princess Palace Pets and the Where's My Water? Apps to have been

10   included in the Family section of Google Play (and therefore for Disney to have enrolled in the

11   Designed for Families program), Disney had to expressly warrant, *inter alia*, that Princess Palace

12   Pets and the Where's My Water? Apps met specific criteria related to privacy laws (set by

13   Google):

14
> Eligibility

15
> All apps participating in the Designed for Families program must be relevant for children under the age of 13 and comply with the eligibility criteria below. App content must be appropriate for children. Google Play reserves the right to reject or remove any app determined to be inappropriate for the Designed for Families program.

16

17

18

19
> …

20
> 2. If your Designed for Families app displays ads, you confirm that:

21
> 2.1 You comply with applicable legal obligations relating to advertising to children.

22
> 2.2 Ads displayed to child audiences do not involve interest-based advertising or remarketing.

23

24
> 2.3 Ads displayed to child audiences present content that is appropriate for children.

25
> 2.4 Ads displayed to child audiences follow the Designed for Families ad format requirements.

26

27
[174] *Id.*

28
[175] *Id.* ("Only apps and games that are part of the Designed for Families program will show up in searches initiated from the Family section in Apps Home.").

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

…

> 7. You represent that apps submitted to Designed for Families are compliant with COPPA (Children's Online Privacy Protection Rule) and other relevant statutes, including any APIs [(a synonym for SDKs)] that your app uses to provide the service.[176]

195.    These requirements apply with equal force in the Apple context.  Apple's App Store Review Guidelines contain identical, privacy-protective requirements for developers, including Disney:

> 1.3 Kids Category
>
> The Kids Category is a great way for people to easily find apps that are appropriate for children. If you want to participate in the Kids Category, you should focus on creating a great experience specifically for younger users. These apps must not include links out of the app, purchasing opportunities, or other distractions to kids unless reserved for a designated area behind a parental gate. Keep in mind that once customers expect your app to follow the Kids Category requirements, it will need to continue to meet these guidelines in subsequent updates, even if you decide to deselect the category. Learn more about parental gates.
>
> Apps in the Kids Category may not include behavioral advertising (e.g. the advertiser may not serve ads based on the user's activity), and any contextual ads must be appropriate for young audiences. You should also pay particular attention to privacy laws around the world relating to the collection of data from children online. Be sure to review the Privacy section of these guidelines for more information.[177]

196.    The document from Apple provides further clarification about data collection practices and privacy obligations for developers listing apps in the Kids section of the Apple App Store:

> 5.1.4 Kids
>
> For many reasons, it is critical to use care when dealing with personal data from kids, and we encourage you to carefully review all the requirements for complying with laws like the Children's Online Privacy Protection Act ("COPPA") and any international equivalents.
>
> Apps may ask for birthdate and parental contact information only

---

[176] *Id.*

[177] "App Store Review Guidelines," Apple, *available at* https://developer.apple.com/app-store/review/guidelines/#kids-category (accessed June 4, 2018).

for the purpose of complying with these statutes, but must include some useful functionality or entertainment value regardless of a person's age.

Moreover, apps in the Kids Category or those that collect, transmit, or have the capability to share personal information (*e.g.* name, address, email, location, photos, videos, drawings, the ability to chat, other personal data, or persistent identifiers used in combination with any of the above) from a minor must include a privacy policy and must comply with all applicable children's privacy statutes. For the sake of clarity, the parental gate requirement for the Kid's Category is generally not the same as securing parental consent to collect personal data under these privacy statutes.[178]

197.    Thus, in marketing Princess Palace Pets and the Where's My Water? Apps and seeking the commercial advantage of the improved visibility to parents afforded by its family-oriented positioning in Google Play and the Apple App Store, Disney warrants that Princess Palace Pets and the Where's My Water? Apps are family-friendly, that the apps (and Disney, generally) act in accordance with all applicable privacy laws and regulations, and that any SDKs contained within Princess Palace Pets and the Where's My Water? Apps will comply with all applicable privacy laws and regulations.

198.    Indeed, Disney specifically holds Princess Palace Pets and the Where's My Water? Apps out to its audience as being family-friendly, knowing that its audience reasonably expects such apps *not* to engage in privacy-violative behavior.

### 2. Disney Explicitly and Falsely States That It Does Not Track Children or Collect Personal Data in Violation of Privacy Laws and Norms.

199.    Disney falsely represents that it does not collect children's personal data in violation of any privacy laws or norms.

200.    As discussed above, Disney markets Princess Palace Pets and the Where's My Water? Apps in sections of Apple's App Store and Google Play Store that are expressly designed for children and families, and in so doing represents that its apps—including Princess Palace Pets and the Where's My Water? Apps—are safe for children and comply with all applicable privacy laws and data collection guidelines.

---

[178] *Id.*

201.   Further, in the Princess Palace Pets and the Where's My Water? Apps privacy

policies (all of which occur under Disney's blanket privacy policy),[179] Disney represents that it

*only* collects user data in accordance with applicable privacy laws, and in a subheading titled

"Children's Privacy," Disney states:

> **We recognize the need to provide <u>further</u> privacy protections
> with respect to personal information we may collect
> from children on our sites and applications**. Some of the features
> on our sites and applications are age-gated so that they are not
> available for use by children, and we do not knowingly collect
> personal information from children in connection with
> those features. When we intend to collect personal information
> from children, we take additional steps to protect children's
> privacy, including:
>
> Notifying parents about our information practices with regard to
> children, including the types of personal information we may
> collect from children, the uses to which we may put that
> information, and whether and with whom we may share that
> information;
>
> In accordance with applicable law, and our practices, obtaining
> consent from parents for the collection of personal information
> from their children, or for sending information about our products
> and services directly to their children;
>
> Limiting our collection of personal information from children to no
> more than is reasonably necessary to participate in an online
> activity; and
>
> Giving parents access or the ability to request access to personal
> information we have collected from their children and the ability to
> request that the personal information be changed or deleted.[180]

202.   Thus, Disney does not simply deceive parents by *omitting* any mention of the data-

exfiltrating SDK's contained within the Princess Palace Pets and Where's My Water? Apps (and

of the attendant Personal Data of children that is acquired by the SDK Defendants and Disney),

but Disney has also affirmatively, and falsely, stated that it does not unlawfully collect Personal

Data from children and indeed that it "recognize[s] the need to provide ***further*** privacy

---

[179] "Privacy Policy," The Walt Disney Company, May 9, 2018, *available at* https://privacy.thewaltdisneycompany.com/en/current-privacy-policy/ (emphasis added) (accessed on June 4, 2018).

[180] *Id.* (emphasis added)

1    protections with respect to personal information…collect[ed] from children on [Disney's] sites

2    and applications."[181]

3         203.    Disney has deceived the public as to the data exfiltration functionality of the

4    Princess Palace Pets and Where's My Water? Apps.  In so doing, it has created the false

5    impression that the Princess Palace Pets and Where's My Water? Apps adhere to child privacy

6    norms.

7                  **3.      Despite its Assertions that it Abides by Privacy Norms and Laws,**
                  **Disney's Chief Executive Officer Publicly Supports Norm and Privacy-**
8                  **Violative Advertising Behaviors.**

9         204.    Disney's Chief Executive Officer, Bob Iger, has publicly and expressly embraced

10   targeted advertising practices in Disney mobile apps, even after recognizing the privacy concerns

11   associated with such practices.

12        205.    In a conference in California in 2009, Iger was reported as saying he was

13   "actually pretty bullish about what technology is going to allow in terms of behavioural tracking,"

14   and brazenly revealed that Disney was "going to have information to sell to marketers."[182]  Iger

15   implicitly compared children playing on Disney mobile apps to adults shopping online for cars:

16   "If we know that you've gone online and looked at five different autos online, you are a great

17   consumer for us to serve up a 30-second ad for a car," Iger said, demonstrating the concept of

18   targeted advertising based on tracking online behaviors.

19        206.    Iger made such statements embracing the concept of  – and profits available from

20   – targeted advertising after acknowledging the privacy concerns implicated by such practices and

21   children's inability to "figure out" targeted advertising,  but reasoned that privacy and norm-

22   violative behavior was acceptable in Disney apps because—in his words—"Kids don't care."[183]

23

24

25   [181] *Id.*

26   [182] Noelle McElhatton, "Disney CEO says young consumers 'don't care' about behavioural
     targeting privacy," Campaign Live, July 27, 2009, *available at*

27   https://www.campaignlive.com/article/disney-ceo-says-young-consumers-dont-care-behavioural-
     targeting-privacy/922859 (accessed June 4, 2018).

28   [183] *Id.* (emphasis added)

AMENDED CLASS ACTION COMPLAINT
                                       CASE NO. 3:17-CV-4419-JD

4.    **The SDK Defendants Violate Their Own Privacy Commitments.**

207.    As alleged herein, the SDK Defendants fail to comply with their own privacy commitments.  Each SDK Defendant posts an online policy that expressly disclaims that individual SDK's suitability for child-directed apps, or makes statements about complying with privacy laws and norms that have been proven false by forensic analysis.  This applies to the SDKs' privacy policies in effect in 2017 when this litigation commenced, as well as to those recently updated to comply with General Data Protection Regulation (or "GDPR") implemented in May 2018.[184]

H.    **Fraudulent Concealment and Tolling.**

208.    The applicable statutes of limitations are tolled by virtue of Defendants' knowing and active concealment of the facts alleged above.  Plaintiffs and Class Members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

209.    At the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs and the Classes and Subclass.  Defendants are therefore estopped from relying on any statute of limitations.

210.    Defendants' fraudulent concealment is common to the Classes and Subclass.

I.    **Named Plaintiff Allegations.**

1.    **Plaintiff Amanda Rushing and Her Child, L.L.**

211.    In January 2014, Ms. Rushing or her child downloaded Disney Princess Palace Pets onto mobile devices in order for her child, L.L., to play the game.  L.L. thereafter frequently played Princess Palace Pets on these devices on an ongoing and continuous basis.

---

[184] Unity: https://unity3d.com/legal/privacy-policy; Upsight: https://www.upsight.com/pricing/privacy-policy/; MoPub: https://www.mopub.com/legal/tos/; Kochava: https://www.kochava.com/website-visitor-privacy-policy/; comScore/ScorecardResearch: https://www.comscore.com/About-comScore/Privacy-Policy and https://www.scorecardresearch.com/TermsOfService.aspx?newlanguage=1.

212.     During the time L.L. played Princess Palace Pets, Disney partnered with the SDK Defendants to collect the personal data of L.L. for the purposes of tracking, profiling, and targeting her.

213.     Prior to the forensic investigation conducted for this action, Ms. Rushing was not aware of the existence of any of the SDK Defendants, did not know that Disney had embedded the SDK Defendants' code in the Princess Palace Pets app her child played, and did not know Defendants were exfiltrating her child's Personal Data as she played Princess Palace Pets to track, profile, and target her.

214.     Defendants' tracking, profiling, and targeting of L.L. without parental consent is highly offensive to Ms. Rushing and constitutes an invasion of her child's privacy and of Ms. Rushing's right to protect her child from this invasion.

### 2.     Plaintiff Ashley Supernault and Her Child, M.S.

215.     In or around 2014, Ms. Supernault or her child downloaded the Disney Apps Where's My Water? Free and Where's My Water? 2 onto mobile devices in order for the child, M.S., to play the games.  M.S. thereafter frequently played Where's My Water? Free and Where's My Water? 2 on these devices on an ongoing and continuous basis.

216.     During the time M.S. played Where's My Water? Free and Where's My Water? 2, Disney partnered with the SDK Defendants to collect the Personal Data of M.S. for the purposes of tracking, profiling, and targeting her.

217.     Prior to the forensic investigation conducted for this action, Ms. Supernault was not aware of the existence of any of the SDK Defendants in the apps, did not know Disney had embedded the SDK Defendants' code in the Where's My Water? Free and Where's My Water? 2 apps her child played, and did not know the Defendants were exfiltrating her child's Personal Data as she played Where's My Water? Free and Where's My Water? 2 to track, profile, and target her.

218.     Defendants' tracking, profiling, and targeting of M.S. without parental consent is highly offensive to Ms. Supernault and constitutes an invasion of her child's privacy and of Ms. Supernault's right to protect her child from this invasion.

1

### 3.   Plaintiff Julie Remold and Her Children, N.B. and C.B.

2      219.    In or around August 2016, Ms. Remold or her children downloaded Disney's

3 Where's My Water? app onto a mobile device in order for the children, N.B. and C.B., to play the

4 game.  N.B. and C.B. thereafter frequently played Where's My Water? on this device on an

5 ongoing and continuous basis.

6      220.    During the time N.B. and C.B. played Where's My Water?, Disney partnered

7 with the SDK Defendants to collect the Personal Data of N.B. and C.B. for the purposes of

8 tracking, profiling, and targeting them.

9      221.    Prior to the forensic investigation conducted for this action, Ms. Remold was not

10 aware of the existence of any of the SDK Defendants in the app, did not know that Disney had

11 embedded the SDK Defendants' code in Where's My Water? app her children played, and did not

12 know the Defendants were exfiltrating her children's Personal Data as they played Where's My

13 Water? to track, profile, and target them.

14      222.    Defendants' tracking, profiling, and targeting of N.B. and C.B. without parental

15 consent is highly offensive to Ms. Remold and constitutes an invasion of her children's privacy

16 and of Ms. Remold's right to protect her children from this invasion.

17

### 4.   Plaintiff Ted Poon and His Children, R.P. and K.P.

18      223.    In or around December 2013 and November 2017, Mr. Poon or his children

19 downloaded the Developer Defendant's App "Where's My Water? Lite" onto mobile devices in

20 order for the children, R.P. and K.P., to play the game.  R.P. and K.P. thereafter frequently played

21 Where's My Water? Lite on these devices on an ongoing and continuous basis.

22      224.    During the time R.P. and K.P. played Where's My Water? Lite, Disney partnered

23 with the SDK Defendants to collect the Personal Data of R.P. and K.P. for the purposes of

24 tracking, profiling, and targeting them.

25      225.    Prior to the forensic investigation conducted for this action, Mr. Poon was not

26 aware of the existence of any of the SDK Defendants in the app, did not know that Disney had

27 embedded the SDK Defendants' code in the Where's My Water? Lite app his children played,

28

1    and did not know the Defendants were exfiltrating his children's personal data as they played

2    Where's My Water? Lite to track, profile, and target them.

3         226.   Defendants' tracking, profiling, and targeting of R.P. and K.P. without parental

4    consent is highly offensive to Mr. Poon and constitutes an invasion of his children's privacy and

5    of Mr. Poon's right to protect his children from this invasion.

6    **VI.    CLASS ALLEGATIONS**

7         227.   Plaintiffs seek class certification of the classes and subclass set forth herein

8    pursuant to Federal Rule of Civil Procedure 23.

9         228.   Plaintiffs seek class certification of claims under California law for the common

10   law privacy cause of action "Intrusion Upon Seclusion," on behalf of a class defined as follows:

11            **The Intrusion Upon Seclusion Class:** all parents and/or legal
              guardians of persons residing in the States of Alabama, Alaska,
12            Arizona, Arkansas, California, Colorado, Connecticut, Delaware,
              Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky,
13            Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New
              Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Oregon,
14            Pennsylvania, South  Dakota, Texas, Utah, Vermont, Washington,
              and West Virginia who are younger than the age of 18, or were
15            younger than the age of 18 when they played a Disney Gaming
              App, from whom Defendants collected, used, or disclosed Personal
16            Data.

17        229.   Plaintiff Amanda Rushing, on behalf of herself and as parent and guardian of her

18   child, L.L., and Plaintiff Julie Remold, on behalf of herself and as parent and guardian of her

19   children, N.B. and C.B., are the proposed Class Representatives for the Intrusion Upon Seclusion

20   Class.

21        230.   Plaintiffs seek class certification of claims for violations of the State of California

22   Constitution Right to Privacy, and of the State of California Unfair Competition Law Cal. Bus. &

23   Prof. Code §§ 17200, *et seq.*, on behalf of a subclass of the Intrusion Upon Seclusion Class,

24   defined as follows:

25            **The California Subclass:** all parents and/or legal guardians of
              persons residing in the State of California who are younger than the
26            age of 18, or were younger than the age of 18 when they played a
              Disney Gaming App, from whom Defendants collected, used, or
27            disclosed Personal Data.

28

231.     Plaintiff Amanda Rushing, on behalf of herself and as parent and guardian of her child, L.L., is the proposed Class Representative for the California Constitutional Right to Privacy claim and Plaintiff Julie Remold, on behalf of herself and as parent and guardian of her children, N.B. and C.B., is the proposed Class Representative for both the California Constitutional Right to Privacy claim and the California UCL claim.

232.     Plaintiffs seek class certification of a claim for violation of the State of New York General Business Law § 349 on behalf of a class defined as follows:

> **The New York Class:**  all parents and/or legal guardians of persons residing in the State of New York who are younger than the age of 18, or were younger than the age of 18 when they played a Disney Gaming App, from whom Defendants collected, used, or disclosed Personal Data.

233.     Plaintiff Ted Poon, on behalf of himself and as parent and guardian of his children, R.P. and K.P., is the proposed Class Representative for the New York Class.

234.     Plaintiffs seek class certification of a claim for violation of the State of Massachusetts General Laws ch. 93A, *et seq.*, and Massachusetts General Laws ch. 214, § 1B on behalf of a class defined as follows:

> **The Massachusetts Class:**  all parents and/or legal guardians of persons residing in the State of Massachusetts who are younger than the age of 18, or were younger than the age of 18 when they played a Disney Gaming App, from whom Defendants collected, used, or disclosed Personal Data.

235.     Plaintiff Ashley Supernault, on behalf of herself and as parent and guardian of her child, M.S., is the proposed Class Representative for the Massachusetts Class.

236.     Plaintiffs reserve the right to modify or refine the Class or Subclass definitions based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

237.     Excluded from the Classes and Subclass are:  (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who

1  properly execute and file a timely request for exclusion from the Classes or Subclass; (d) persons

2  whose claims in this matter have been finally adjudicated on the merits or otherwise released;

3  (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns

4  of any such excluded persons.

5       238.  **Ascertainability.**  The proposed Classes and Subclass are readily ascertainable

6  because they are defined using objective criteria so as to allow Class Members to determine if

7  they are part of a Class or Subclass.  Further, the Classes and Subclass can be readily identified

8  through records maintained by Defendants.

9       239.  **Numerosity (Rule 23(a)(1)).**  The Classes and Subclass are so numerous that

10  joinder of individual members herein is impracticable.  The exact number of Class or Subclass

11  Members, as herein identified and described, is not known, but download figures indicate that the

12  Disney Gaming Apps have been downloaded hundreds of millions of times.[185]

13       240.  **Commonality (Rule 23(a)(2)).**  Common questions of fact and law exist for each

14  cause of action and predominate over questions affecting only individual Class and Subclass

15  Members, including the following:

16            i.  Whether Developer Defendants engaged in the activities referenced

17  in paragraphs 24 to 153 and 182 to 207 via the Disney Gaming Apps;

18            ii.  Whether the SDK Defendants engaged in the activities referenced

19  in paragraphs 24 to 153 and 182 to 207 via the Disney Gaming Apps;

20            iii.  Whether Defendants' acts and practices complained of herein

21  amount to acts of intrusion upon seclusion under the law of California;

22            iv.  Whether Defendants' conduct violated Subclass Members'

23  California constitutional Right to Privacy;

24            v.  Whether Defendants' acts and practices complained of herein

25  violate California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.;

26

27

28  [185] *See* n.11, *infra*.

1   vi.   Whether Defendants' acts and practices complained of herein

2   violate New York General Business Law § 349;

3   vii.   Whether Defendants' acts and practices complained of herein

4   violate Massachusetts General Laws ch. 93A, *et seq.*;

5   viii.   Whether Defendants' acts and practices complained of herein

6   violate Massachusetts General Laws ch. 214, § 1B;

7   ix.   Whether members of the Classes and Subclass have sustained

8   damages, and, if so, in what amount; and

9   x.   What is the appropriate injunctive relief to ensure Defendants no

10   longer illegally collect children's personal information to track, profile, and target them over time

11   and across different websites or online services.

12   241.   **Typicality (Rule 23(a)(3)).**  Plaintiffs' claims are typical of the claims of members

13   of the proposed Classes and Subclass because, among other things, Plaintiffs and members of the

14   Classes and Subclass sustained similar injuries as a result of Defendants' uniform wrongful

15   conduct and their legal claims all arise from the same events and wrongful conduct by

16   Defendants.

17   242.   **Adequacy (Rule 23(a)(4)).**  Plaintiffs will fairly and adequately protect the

18   interests of the proposed Classes and Subclass.  Plaintiffs' interests do not conflict with the

19   interests of the Classes and Subclass Members and Plaintiffs have retained counsel experienced in

20   complex class action and data privacy litigation to prosecute this case on behalf of the Classes

21   and Subclass.

22   243.   **Predominance & Superiority (Rule 23(b)(3)).**  In addition to satisfying the

23   prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under

24   Rule 23(b)(3).  Common questions of law and fact predominate over any questions affecting only

25   individual Class and Subclass Members, and a class action is superior to individual litigation and

26   all other available methods for the fair and efficient adjudication of this controversy.  The amount

27   of damages available to individual Plaintiffs is insufficient to make litigation addressing

28   Defendants' conduct economically feasible in the absence of the class action procedure.

1    Individualized litigation also presents a potential for inconsistent or contradictory judgments, and

2    increases the delay and expense presented by the complex legal and factual issues of the case to

3    all parties and the court system.  By contrast, the class action device presents far fewer

4    management difficulties and provides the benefits of a single adjudication, economy of scale, and

5    comprehensive supervision by a single court.

6        244.    **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).**  Plaintiffs also satisfy

7    the requirements for maintaining a class action under Rule 23(b)(2).  Defendants have acted or

8    refused to act on grounds that apply generally to the proposed Classes and Subclass, making final

9    declaratory or injunctive relief appropriate with respect to the proposed Classes and Subclass as a

10   whole.

11       245.    **Particular Issues (Rule 23(c)(4)).**  Plaintiffs also satisfy the requirements for

12   maintaining a class action under Rule 23(c)(4).  Their claims consist of particular issues that are

13   common to all Class and Subclass Members and are capable of class-wide resolution that will

14   significantly advance the litigation.

15   **VII.    CLAIMS FOR RELIEF**

16                                      **COUNT I**
                                **Intrusion Upon Seclusion**
17                  **(Brought on Behalf of the Intrusion Upon Seclusion Class)**

18       246.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

19       247.    California law on intrusion upon seclusion is applicable for all members of the

20   Intrusion Upon Seclusion Class because there is no conflict of law between the law in California

21   and any of the states in which the Class Members reside.  The jurisprudence in California and

22   each of the relevant states adheres to Restatement (Second) of Torts, § 652B with no material

23   variation.  Accordingly, because the law on intrusion upon seclusion in each of the states where

24   the Class Members reside does not materially differ from the law of the forum state of California,

25   the law of California applies for adjudication of all members of the Class.

26       248.    "One who intentionally intrudes, physically or otherwise, upon the solitude or

27   seclusion of another or his private affairs or concerns, is subject to liability to the other for

28

1    invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

2    Restatement (Second) of Torts, § 652B.

3        249.    Plaintiff Amanda Rushing, and her child, L.L., and Plaintiff Julie Remold, and her

4    children, N.B. and C.B., and Class Members have reasonable expectations of privacy in their

5    mobile devices and their online behavior, generally.  Plaintiffs' and Class Members' private

6    affairs include their behavior on their mobile devices as well as any other behavior that may be

7    monitored by the surreptitious tracking employed or otherwise enabled by Disney.

8        250.    The reasonableness of such expectations of privacy is supported by Disney's

9    unique position to monitor Plaintiffs' and Class Members' behavior through their access to

10   Plaintiffs' and Class Members' private mobile devices.  It is further supported by the

11   surreptitious, highly-technical, and non-intuitive nature of Defendants' tracking.

12       251.    Defendants intentionally intruded on and into Plaintiffs' and Class Members'

13   solitude, seclusion, or private affairs by intentionally designing the Disney Gaming Apps (as well

14   as all SDKs identified in this Complaint) to surreptitiously obtain, improperly gain knowledge of,

15   review, and/or retain Plaintiffs' and Class Members' activities through the monitoring

16   technologies and activities described herein.

17       252.    These intrusions are highly offensive to a reasonable person.  This is evidenced by,

18   *inter alia*, countless consumer surveys, studies, and op-eds decrying the online tracking of

19   children, centuries of common law, state and federal statutes and regulations, legislative

20   commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines,

21   and scholarly literature on consumers' reasonable expectations.  Further, the extent of the

22   intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and

23   Class Members' personal information with potentially countless third-parties, known and

24   unknown, for undisclosed and potentially unknowable purposes, in perpetuity.  Also supporting

25   the highly offensive nature of Defendants' conduct is the fact that Defendants' principal goal was

26   to surreptitiously monitor Plaintiffs and Class Members—in one of the most private spaces

27   available to an individual in modern life—and to allow third-parties to do the same.

28

253.    Defendants' intrusion into the sacrosanct relationship between parent and child and subsequent commercial exploitation of children's special vulnerabilities online also contributes to the highly offensive nature of Defendants' activities.

254.    Plaintiffs and Class Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

255.    Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class Members.

256.    As a result of Defendants' actions, Plaintiffs and Class Members seek injunctive relief, in the form of Defendants' cessation of tracking practices in violation of state law, and destruction of all personal data obtained in violation of state law.

257.    As a result of Defendants' actions, Plaintiffs and Class Members seek nominal and punitive damages in an amount to be determined at trial.  Plaintiffs and Class Members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful— were calculated to injure Plaintiffs and made in conscious disregard of Plaintiffs' rights.  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

258.    Plaintiffs seek restitution for the unjust enrichment obtained by Defendants as a result of unlawfully collecting Plaintiffs' and Class Members' children's personal data.  These intrusions are highly offensive to a reasonable person.  This is evidenced by, *inter alia*, the legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying the online tracking of children.  Further, the extent of the intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and Class Members' children's personal information with potentially countless third-parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity.  Also supporting the highly offensive nature of Defendants' conduct is the fact that Defendants' principal goal was to surreptitiously monitor Plaintiffs' and Class Members' children—in one of the most private spaces available to an individual in modern life—and to allow third-parties to do the same.

**COUNT II**
**California Constitutional Right to Privacy**
**(Brought on Behalf of the California Subclass of the Intrusion Upon Seclusion Class)**

259.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

260.   Plaintiff Amanda Rushing, and her child, L.L., and Subclass Members have reasonable expectations of privacy in their mobile devices and their children's online behavior, generally.  Plaintiff's and Subclass Members' children's private affairs include their behavior on their mobile devices, as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Disney.

261.   The reasonableness of such expectations of privacy is supported by Disney's unique position to monitor Plaintiff's and Subclass Members' children's behavior through their access to Plaintiff's and Subclass Members' children's private mobile devices.  It is further supported by the surreptitious, highly-technical, and non-intuitive nature of Defendants' tracking.

262.   Defendants intentionally intruded on and into Plaintiff's and Subclass Members' and their children's solitude, seclusion, right of privacy, or private affairs by intentionally designing the Disney Gaming Apps (as well as all SDKs identified in this Complaint) to surreptitiously obtain, improperly gain knowledge of, review, and/or retain Plaintiff's and Subclass Members' children's activities through the monitoring technologies and activities described herein.

263.   These intrusions are highly offensive to a reasonable person, because they disclosed sensitive and confidential information about children, constituting an egregious breach of social norms.  This is evidenced by, *inter alia*, countless consumer surveys, studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations. Further, the extent of the intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiff's and Subclass Members' children's personal information with potentially countless third-parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity.  Also supporting the highly offensive nature of Defendants'

1   conduct is the fact that Defendants' principal goal was to surreptitiously monitor Plaintiff's and

2   Subclass Members' children—in one of the most private spaces available to an individual in

3   modern life—and to allow third-parties to do the same.

4          264.    Defendants' intrusion into the sacred relationship between parent and child and

5   subsequent commercial exploitation of children's special vulnerabilities online also contributes to

6   the highly offensive nature of Defendants' activities.

7          265.    Plaintiff and Subclass Members were harmed by the intrusion into their private

8   affairs as detailed throughout this Complaint.

9          266.    Defendants' actions and conduct complained of herein were a substantial factor in

10  causing the harm suffered by Plaintiff and Subclass Members and their children.

11         267.    As a result of Defendants' actions, Plaintiff and Subclass Members seek injunctive

12  relief, in the form of Defendants' cessation of tracking practices in violation of state law, and

13  destruction of all personal data obtained in violation of state law.

14         268.    As a result of Defendants' actions, Plaintiff and Subclass Members seek nominal

15  and punitive damages in an amount to be determined at trial.  Plaintiff and Class Members seek

16  punitive damages because Defendants' actions—which were malicious, oppressive, willful—

17  were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and her

18  child's rights.  Punitive damages are warranted to deter Defendants from engaging in future

19  misconduct.

20                                **COUNT III**
                         **Violation of N.Y. Gen. Bus. Law § 349**
21                      **(Brought on Behalf of the New York Class)**

22         269.    Plaintiff repeats and realleges all preceding paragraphs contained herein.

23         270.    Plaintiff Ted Poon and his children, R.P. and K.P., and Class Members are

24  "persons" within the meaning of New York General Business Law § 349(h).

25         271.    Each Defendant is a "person," "firm," "corporation," or "association" within the

26  meaning of N.Y. Gen. Bus. Law § 349.

27         272.    Section 349 makes unlawful "[d]eceptive acts or practices in the conduct of any

28  business, trade or commerce."

273.    Defendants' conduct constitutes "deceptive acts or practices" within the meaning of N.Y. Gen. Bus. Law § 349.  Defendants surreptitiously tracked children without disclosing their activities to their parents, in violation of applicable laws and reasonable expectations of privacy.

274.    Defendants' conduct occurred in the conduct of trade or commerce, and was directed at consumers.

275.    Defendants' conduct was misleading in a material way, because, *inter alia*, Defendants used the Disney Gaming Apps as a vehicle for secretly and intentionally tracking and profiling child users, over time and across different online platforms, without providing notice or obtaining consent.  As a result, parents are denied the opportunity to make informed decisions on whether to permit Defendants to exfiltrate their children's Personal Data and share it with third-parties for commercial and other undisclosed purposes.  Given the entirely surreptitious and intentional nature of the tracking technology at play, and Defendants exclusive knowledge of it, Defendants had a duty to disclose the nature of their conduct.  Defendants were also obligated to obtain parental consent before tracking and exfiltrating children's Personal Data.  By failing to disclose its ability to track child users who play the Disney Gaming Apps, Defendants purposely misled Plaintiff and Class Members.

276.    As detailed in the allegations in Sections V.A., V.C., and V.E, unlike aggregated or anonymized data, the Personal Data collected and used by each of the Defendants is identifiable or associable with specific, individual child users, is as persistent as a social security number, and can be used to track, profile, and target children across multiple devices and over time.

277.    As a result of Defendants' deceptive acts and practices, Plaintiff and Class Members were injured and damaged in that they suffered a loss of privacy and autonomy through Defendants' acquisition and use of children's personal information, for Defendants' own benefit, without Plaintiff's or the Class Members' knowledge or verifiable parental consent.

278.    Because Defendants' willful and knowing conduct caused injury to Plaintiff and Class Members and their children, the Class seeks recovery of actual damages or $50, whichever

1   is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys'

2   fees and costs, an order enjoining Defendants' deceptive conduct, and any other just and proper

3   relief available under N.Y. Gen. Bus. Law § 349.  Plaintiff and Class Members seek punitive

4   damages because Defendants' actions—which were malicious, oppressive, willful—were

5   calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights.  Punitive

6   damages are warranted to deter Defendants from engaging in future misconduct.

## COUNT IV
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (Brought on Behalf of the California Class)

279.    Plaintiff and Class Members reallege and incorporate by reference every

allegation set forth in the preceding paragraphs as though alleged in this Count.

280.    Defendants' conduct as alleged herein constitutes unfair, unlawful, or fraudulent

business acts or practices as proscribed by Section 17200, *et seq.*, of the California Business &

Professions Code ("UCL").

281.    Defendants' conduct is "fraudulent" under the UCL because it is likely to deceive

the public, including the reasonable parent and child user.  Defendants failed to disclose that they

collect and exfiltrate Personal Data for tracking and profiling purposes.  Defendants knew or had

reason to know that Plaintiff and Class Members could not have reasonably known or discovered

the existence of the SDKs, without disclosure by Defendants. Defendants' conduct conveys to

parents that Defendants will abide by social norms and not collect the Personal Data of their

children without express parental consent.  Defendants fail to obtain parental consent, and collect

children's Personal Data anyway.  Defendants prevented Plaintiff and Class Member parents and

their children from avoiding Defendants' data practices, and prevented parents from protecting

their children's right to privacy.

282.    Plaintiff Remold reasonably relied on the omissions and misrepresentations of

Defendants as alleged herein. Had Defendants disclosed to Plaintiff Remold that the Where's My

Water? app employed tracking software, Plaintiff Remold, acting reasonably under the

circumstances, would not have purchased the Where's My Water? app.

283.    Defendants' conduct constitutes "unfair" business acts or practices. Plaintiffs and Class Members have an interest in controlling the disposition and dissemination of their children's Personal Data.  Contrary to Plaintiff's and Class Members' interests, Defendants surreptitiously exfiltrated Plaintiff's and Class Members' children's Personal Data, exploiting it for sale and profit without consent.  The loss of privacy and autonomy suffered by Plaintiff, Class Members, and their children outweighs the profit motive for Defendants' unauthorized and secretive collection and dissemination of children's Personal Data via the Where's My Water? app.

284.    Defendants' conduct constitutes "unlawful" business acts or practices by virtue of their conduct constituting intrusion upon seclusion and violations of California's Constitutional Right of Privacy.  In addition, Defendants' conduct violates the standards reflected in the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6502, which serves as an additional and independent basis for Defendants' violation of the "unlawful" prong of the UCL.

285.    Plaintiff Remold suffered injury in fact and lost money or property as a result of the Defendants' business acts and/or practices.  But for Defendants' unfair, unlawful, or fraudulent business acts or practices, Plaintiff Remold would not have purchased Defendants' Where's My Water? app.

286.    Plaintiff and Class Members seek an order to enjoin Defendants from such unlawful, unfair, and fraudulent business acts or practices, and to restore to Plaintiffs and Class Members their interest in money and/or property that might have been acquired by Defendants by means of unfair competition.

**COUNT V**
**Violation of Massachusetts' Unfair and Deceptive Trade Practices Statute Massachusetts General Laws ch. 93A, et seq.**
**(On Behalf of the Massachusetts Class)**

287.    Plaintiff and Class Members reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

288.    Defendants' acts and practices complained of herein—including, but not limited to, contracting for the installation of SDKs in Disney's child-oriented Gaming Apps and secretly

1  collecting and sharing Plaintiff's and Class Members' children's Personal Data without parental

2  consent—amount to "[u]nfair methods of competition and unfair or deceptive acts or practices in

3  the conduct of any trade or commerce," as proscribed by Massachusetts General Laws ch. 93A.

4      289.    Plaintiff and Class Members, and their children, suffered actual injury—in the

5  form of the purchase price of the Where's My Water? app and/or their loss of privacy and

6  autonomy—as a result of Defendants' acts, practices, and omissions described herein.

7      290.    As a result of Defendants' violation of Massachusetts's Unfair and Deceptive

8  Trade Practices Statute, Plaintiff and Class Members are entitled to—and accordingly seek—

9  actual, nominal, and/or statutory damages and reasonable attorneys' fees, pursuant to

10  Massachusetts General Laws ch. 93A, § 9.

11

12  

**COUNT VI**
**Violation of Massachusetts' Statutory Right to Privacy**
**Massachusetts General Laws ch. 214, § 1B**
**(On Behalf of the Massachusetts Class)**

13

14      291.    Plaintiff incorporates by reference all the preceding allegations as if fully set forth

15  herein.

16      292.    Pursuant to Massachusetts General Laws ch. 214, § 1B, Massachusetts guarantees

17  persons freedom from unreasonable, substantial, or serious interference with their privacy.

18      293.    Defendants' acts and practices complained of herein have violated the law

19  guaranteeing the privacy rights of Plaintiff and Class Member parents and their children.

20  **VIII.**   **PRAYER FOR RELIEF**

21      WHEREFORE, Plaintiffs, individually and on behalf of their children and all others

22  similarly situated, respectfully request that this Court:

23      a.    Certify this case as a class action, appoint Plaintiffs as Class and Subclass

24  representatives, and appoint Plaintiffs' counsel to represent the Classes and Subclass;

25      b.    Find that Defendants' actions, as described herein, constitute: (i) violations

26  of New York General Business Law § 349, (ii) breaches of the common law claim of intrusion

27  upon seclusion under the law of the State of California and as to the Intrusion Upon Seclusion

28  Class;  (3) violations of the right to privacy under California Constitution, Article I, Section 1; (4)

1 violations of California's UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (5) violations of

2 Massachusetts General Laws ch. 93A, *et seq.*; and (6) violations of Massachusetts General Laws

3 ch. 214, § 1B.

4   c. Award Plaintiffs and Class and Subclass Members appropriate relief,

5 including actual, nominal, and/or statutory damages and punitive damages, in an amount to be

6 determined at trial;

7   d. Award restitution to Plaintiffs and Class and Subclass Members for

8 Defendants' unjust enrichment;

9   e. Award equitable, injunctive, and declaratory relief as may be appropriate;

10   f. Award all costs, including experts' fees, attorneys' fees, and the costs of

11 prosecuting this action; and

12   g. Grant such other legal and equitable relief as the Court may deem

13 appropriate.

14

15 Dated: June 4, 2018    Respectfully Submitted,

16      /s/ _____

17      Michael W. Sobol (State Bar No. 194857)
18      msobol@lchb.com
       Facundo Bouzat (SBN 316957)
19      fbouzat@lchb.com
       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
20      275 Battery Street, 29th Floor
       San Francisco, CA  94111-3339
21      Telephone:  415.956.1000
       Facsimile:  415.956.1008

22      Nicholas Diamand (admitted *Pro Hac Vice*)
       ndiamand@lchb.com
23      Douglas I. Cuthbertson (admitted *Pro Hac Vice*)
       dcuthbertson@lchb.com
24      Abbye R. Klamann (State Bar No. 311112)
       aklamann@lchb.com
25      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
       250 Hudson Street, 8th Floor
26      New York, NY  10013-1413
       Telephone:  212.355.9500
27      Facsimile:  212.355.9592

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

1                                         Hank Bates (State Bar No. 167688)
hbates@cbplaw.com

2                                         Allen Carney (admitted *Pro Hac Vice*)
acarney@cbplaw.com

3                                         David Slade (admitted *Pro Hac Vice*)
dslade@cbplaw.com

4                                         CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.

5                                         Little Rock, AR 72201
Telephone:  501.312.8500

6                                         Facsimile:  501.312.8505

7                                         *Attorneys for Plaintiffs and the proposed Classes and Subclass.*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4419-JD

1

2                            **DEMAND FOR JURY TRIAL**

3            Plaintiffs hereby demand a trial by jury of all issues so triable.

4

   Dated: June 4, 2018                     Respectfully Submitted,

5                                          /s/   *[signature]*

6

7                                          Michael W. Sobol (State Bar No. 194857)
                                           msobol@lchb.com
                                           Facundo Bouzat (SBN 316957)
8                                          fbouzat@lchb.com
                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
9                                          275 Battery Street, 29th Floor
                                           San Francisco, CA  94111-3339
10                                         Telephone:  415.956.1000
                                           Facsimile:  415.956.1008
11
                                           Nicholas Diamand (admitted *Pro Hac Vice*)
12                                         ndiamand@lchb.com
                                           Douglas I. Cuthbertson (admitted *Pro Hac Vice*)
13                                         dcuthbertson@lchb.com
                                           Abbye R. Klamann (State Bar No. 31112)
14                                         aklamann@lchb.com
                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
15                                         250 Hudson Street, 8th Floor
                                           New York, NY  10013-1413
16                                         Telephone:  212.355.9500
                                           Facsimile:  212.355.9592
17
                                           Hank Bates (State Bar No. 167688)
18                                         hbates@cbplaw.com
                                           Allen Carney (admitted *Pro Hac Vice*)
19                                         acarney@cbplaw.com
                                           David Slade (admitted *Pro Hac Vice*)
20                                         dslade@cbplaw.com
                                           CARNEY BATES & PULLIAM, PLLC
21                                         519 W. 7th St.
                                           Little Rock, AR 72201
22                                         Telephone:  501.312.8500
                                           Facsimile:  501.312.8505
23
                                           *Attorneys for Plaintiffs and the Proposed Classes and*
24                                         *Subclass.*

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
                                           CASE NO. 3:17-CV-4419-JD